STATE OF NORTH CAROLINA v. DONALD PAUL BINDYKE

No. 34

(Filed 17 December 1975)

1. **Conspiracy § 3— criminal conspiracy defined**

A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means, but to constitute a conspiracy it is not necessary that the parties should have come together and agreed in express terms to unite for a common object; rather, a mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense.

2. **Conspiracy § 3— agreement as crime — necessity of action**

The conspiracy is the crime and not its execution; therefore, no overt act is necessary to complete the crime of conspiracy.

3. **Conspiracy § 5— acts and declarations of conspirator — admissibility against co-conspirators**

Once a conspiracy has been shown to exist, the acts and declarations of each conspirator, done or uttered in furtherance of a common illegal design, are admissible in evidence against all.

4. **Conspiracy § 6— unsupported testimony of co-conspirator — sufficiency of evidence**

The unsupported testimony of a co-conspirator is sufficient to sustain a verdict, although the jury should receive and act upon such testimony with caution.

5. **Conspiracy § 6; Property § 4— conspiracy to damage bushes and fence — sufficiency of evidence**

Evidence was sufficient to establish a conspiracy among defendant, Montgomery and Moon to set fire to the town mayor's bushes or fence where the evidence tended to show that the board of aldermen were considering whether to dismiss defendant as the town chief of police, the mayor favored dismissal, defendant and Montgomery, a police sergeant, were good friends, defendant discussed with Montgomery his uncertain tenure as police chief, he told Montgomery he might need help in retaining his position and later told Montgomery to send Moon to his home, the three men met at defendant's house and talked, defendant discussed with Montgomery and Moon various scare tactics which he had used in Pennsylvania including threatening phone calls, throwing rocks through windows, sending "the target" a coffin, and hanging dummies in his yard, defendant later told Moon that the mayor and the board needed pressure put on them and that he had in mind a bomb, Moon said he would help and would keep in touch with defendant through Montgomery, Moon thereafter began to harass the mayor, defendant promised Moon that those involved in the activities against the mayor would "be given amnesty," defendant told Montgomery later that the mayor was not scared enough and "needed a fire in his bushes or on his fences," Montgomery related this information to Moon, and Moon acted on it.

6. **Conspiracy § 6; Property § 4— attempted firebombing of car — responsibility of conspirator without knowledge of attempt**

Where the attempted firebombing of the mayor's automobile in the driveway beside his house was done in furtherance of the basic purpose of the conspiracy among defendant and two others, which was to intimidate the mayor and mayor pro tem by damaging their real and personal property and by general threats of fire, defendant was criminally responsible for the attempted firebombing, even if there were no evidence to indicate that he knew about the firebombing or participated in it, since it was a natural and foreseeable consequence of the conspiracy which he had entered.

7. **Indictment and Warrant § 9; Property § 4— variance between indictment and proof not fatal — no principals and accessories in misdemeanors — malicious damage to property**

Where the information charged defendant feloniously aided and abetted in the malicious damage to real property by use of incendiary material—allegations sufficient to support a felony conviction under G.S. 14-49 or a misdemeanor conviction under G.S. 14-127—and the evidence tended to show defendant was an accessory before the fact, nonsuit on the ground of fatal variance was not required since the court submitted only the charge that defendant's conduct amounted to a violation of G.S. 14-127, there being no distinction between principals and accessories in misdemeanors.

**8. Jury § 3— twelve jurors — presence of alternate — error**

The jury contemplated by the N. C. Constitution is a body of twelve persons who reach their decision in the privacy and confidentiality of the jury room, and the presence of an alternate juror in the jury room after a criminal case has been submitted to the regular panel of twelve is always error.

**9. Jury § 3; Constitutional Law § 29— right to trial by twelve jurors — alternate in jury room — procedure**

The requirements of G.S. 9-18 and N. C. Constitution Art. I, § 24, and similar statutes and constitutional provisions in other jurisdictions, are mandatory, and a violation of the statutes and provisions by the presence of an alternate juror in the jury room during the jury's deliberations constitutes reversible error *per se;* however, if an alternate juror inadvertently enters the jury room and the trial judge believes it probable that the jury has not begun its consideration of the evidence, he may recall the jury and alternate and, in open court, inquire of them whether there had been *any* discussion of the case. If the answer is YES, the judge must declare a mistrial; if the answer is No, the jury will retire to begin its deliberation.

Justice HUSKINS dissenting.

Justices COPELAND and EXUM join in the dissenting opinion.

ON *writ of certiorari* to review the decision of the Court of Appeals, reported in 25 N.C. App. 273, 212 S.E. 2d 666 (1975), affirming the judgments entered by *Chess, J.,* at the 19 August 1974 Session of ALAMANCE Superior Court.

Defendant was tried upon an information which charged: (1) that on 10 June 1974 he feloniously conspired with Stephen Montgomery and Gregory Moon to wilfully and maliciously damage the real and personal property of Harold Younger by planning and agreeing "to set fire to the bushes or fence located on the said Younger's property"; (2) that on 10 June 1974 he feloniously and maliciously attempted to damage Harold Younger's personal property, a 1967 Buick automobile, by the use of an incendiary device, a jar containing gasoline and ignited rag; and (3) that on 11 June 1974 he feloniously aided and abetted Moon, Moore, Glenn, and Montgomery in maliciously damaging the real property of W. H. Laughlin by use of incendiary material. "Said damage ·. . . was in the nature of setting fire to the front yard lawn after gasoline had been set on it."

The State's evidence consisted primarily of the testimony of Stephen Montgomery and Gregory Moon, self-confessed con-

spirators of defendant. Their testimony and that of others tended to show the facts summarized below:

For several months prior to 24 June 1974 defendant was Chief of Police of the town of Gibsonville. In late May, defendant was called to the scene of an automobile accident. While attempting to aid one of the victims he got into an argument with some of the spectators who had gathered at the scene, and he placed one "subject" under arrest. In consequence, a petition was circulated calling for defendant's resignation.

In early June the town's Board of Aldermen met three times to discuss defendant's continuance as Chief of Police. At these meetings Mayor Harold Younger and the Mayor Pro Tem, Alderman W. H. Laughlin, expressed the opinion that Chief Bindyke should resign. During this time defendant had a number of conversations with Stephen Montgomery, a sergeant in the Gibsonville Police Department, who was defendant's trusted friend. The two talked about defendant's position as Chief of Police and defendant "stated that he might need some help on his future position with the department."

On the morning of 3 June, Montgomery went to defendant's home, and defendant directed Montgomery to send Gregory Moon by to talk with him. That afternoon Montgomery and Moon talked with defendant at his residence. Defendant was upset with the Board of Aldermen and the Mayor. He talked about using against them scare tactics and other methods of coercion which he had employed while working in Pittsburgh. These included making threatening telephone calls and hanging dummies in people's yards, sending coffins and other bizarre materials to the victim's residence. Defendant stated at that time that maybe he would make some telephone calls.

On 4 June, pursuant to Montgomery's directive, Moon telephoned defendant at his residence. Defendant told Moon he was tired of being maligned by the Mayor and the Board of Aldermen and that some pressure needed to be put upon them. He indicated that he had in mind a bomb. Moon agreed to help and told defendant he would keep in touch with him through Steve Montgomery.

On 5 June, Moon telephoned the Alamance County Rescue Squad and falsely reported that someone had taken an overdose of barbiturates at Mayor Younger's house. He requested that an ambulance be sent to that address. Defendant came to Mont-

gomery's apartment and laughed when he learned the call had been made. Later that night Moon threw two socks containing several rocks through the picture window of the Mayor's home.

On 6 June, Moon went to defendant's office to talk with him alone. At that point defendant asked why Moon had used the socks, and Moon indicated that by using them he could throw the rocks a greater distance. Defendant laughed and thought it amusing. Later that day Moon ordered a load of concrete to be delivered to the Mayor's house.

Sometime prior to 10 June, Moon had a conversation with defendant in which defendant promised amnesty to all those involved in the scare tactics directed at the Mayor and Aldermen. He said that they could "more or less run the town of Gibsonville" without fear of arrest or prosecution.

Around 8 June, Montgomery talked with defendant who said he did not believe the Mayor was sufficiently frightened and that maybe the Mayor needed a fire in the bushes or fences in his yard. On 9 June, Montgomery related this information to Moon. On 10 June, Montgomery drove Moon by the Mayor's house to show him its location. At that time Moon observed the Mayor's 1967 Buick and stated that he was going to throw a Molotov cocktail at it.

At this point in the trial Moon's testimony differs from that of Montgomery. Montgomery testified he told Moon that defendant had wondered how the Mayor would like a fire in his bushes or in his yard. According to Montgomery the idea to bomb the car originated with Moon. On the other hand Moon testified that Montgomery told him at this 8 June meeting that defendant wanted him (Moon) to firebomb the Mayor's car. According to Moon's testimony, the plan to bomb the car had its genesis with defendant. In either event Montgomery agreed to drive by that night to see if the car was still there and to inform Moon if it was. At approximately 9:00 p.m. Montgomery informed Moon that the car was still parked in the driveway and shortly thereafter Montgomery received a call to go by defendant's house. He went there and they talked.

Meanwhile, Moon and his friend, Bobby Glenn, prepared a Molotov cocktail and went to the Mayor's house. Once there, Moon lighted the fuse and threw the makeshift firebomb at the Mayor's car. Moon and Glenn quickly sped away. The fire went out, and neither the car nor the bushes or fences were burned.

Later Moon and Glenn went to defendant's residence where defendant gave them a "stiff drink." Glenn mentioned that the price of gasoline had certainly gone up in Gibsonville. Defendant then said, "Oh, my God, what have you boys gotten me into tonight?"

Later that night Montgomery took Moon to Burlington where Moon telephoned the Mayor telling him that he was Satan, the god of fire, and that he would be back to see him.

The next day, 11 June, Alderman Laughlin made a radio speech which was adverse to defendant. Later that day Montgomery, who had not heard the broadcast, went by to see defendant whom he found to be "upset" because of the broadcast. Defendant told Montgomery that "he wondered how Laughlin would like some fire in his front yard." Montgomery told defendant "that that could be arranged." Montgomery then found Moon and told him the Chief needed a fire on the lawn of Hal Laughlin. Montgomery then took Moon in his car and showed him where Laughlin lived. Later that evening Montgomery went to defendant's residence and defendant told Montgomery that Moon was going to need some gas. Defendant gave him six quarts of gas in several plastic jugs, told him to put them in his patrol car and deliver them to Moon at 10:00 p.m. at the Gibsonville High School. Defendant also gave him directions to be followed that night. In order to create a diversion, and to deflect suspicion, defendant said that at approximately 10:15 he would take a shot at himself and he would then radio Montgomery that someone had fired upon him. At that point Montgomery was to turn on his blue light and siren which would be a signal to Moon and his cohorts to set the fire in Alderman Laughlin's yard.

Montgomery delivered the gas to Moon and explained the plan to him. At approximately 10:18 p.m. Montgomery received a call from defendant calling for assistance. Montgomery turned on his siren and he and another officer proceeded to defendant's house. When they arrived defendant said he had gone out to investigate his dogs' barking and someone had fired upon him. He said that he returned the fire and saw a large dark car drive away.

Meanwhile, upon hearing the sirens, Moon and others had gone to Alderman Laughlin's and poured the gasoline on the lawn spelling out the word "Satan" in four feet letters. They

ran out of gas before completing the word and had to leave in order to obtain more. As they were returning to Alderman Laughlin's defendant drove up behind them in an unmarked police car. He followed them a short distance and then turned off. Moon continued to Alderman Laughlin's and once there poured out the additional gas, lighted the fire, and left.

Alderman Laughlin immediately reported the fire, and Montgomery and another officer came by and helped extinguish it. Later that night Moon telephoned Laughlin and Mayor Younger, "generally speaking of Satan."

The next morning defendant met with Montgomery and Moon and told them that federal and state officers were in town investigating the recent incidents. Defendant said that tracers had been put on the telephone, and he directed Moon and the others to take no further action.

Defendant was dismissed from the Gibsonville police force on 24 June. He then went to Morehead City, where he stayed until 5 July, when Montgomery was arrested. After Montgomery's arrest he gave the officers a statement which led to defendant's arrest. Moon was arrested on 3 July.

At the conclusion of the State's evidence defendant moved for a nonsuit as to all the charges against him. The motions were denied. Defendant elected to offer no evidence, and the judge charged the jury with regard to the three counts in the information. As to the third count he submitted the charge of "aiding and abetting wilful and wanton damage to real property," a misdemeanor.

At the conclusion of the instructions the jury retired to the jury room to begin their deliberations. The court inadvertently failed to dismiss the alternate juror, who accompanied the jury into the jury room. The matter was called to the judge's attention and, after the jury had been out of the courtroom approximately three or four minutes, it was recalled. "The thirteenth juror" was then summarily dismissed, and the twelve were instructed to go back and resume their deliberations "without the alternate."

Defendant was found guilty on each of the three counts as submitted. On the first count, conspiracy to damage real and personal property, he was sentenced to two years (G.S. 14-127) ; on the second count, attempt to damage personal property by

the use of an incendiary device (G.S. 14-49 (b), (c)), to not less than two nor more than three years; on the third count, aiding and abetting wilful and wanton damage to real property (G.S. 14-127), twelve months. All sentences were made to run concurrently. Defendant appealed; the Court of Appeals affirmed, and we allowed certiorari to consider the questions presented.

(Here we note that the record contains the information that at the conclusion of defendant's trial Gregory Z. Moon, Stephen D. Montgomery, and Bobby H. Glenn, Jr., each pled guilty to a charge of malicious damage to personal property by the use of an incendiary device, charges which grew out of the events for which defendant Bindyke was tried in this case. Each received a prison sentence of from two to three years.)

*Rufus L. Edmisten, Attorney General; Archie W. Anders, Associate Attorney, for the State.*

*Harris & McEntire and Loflin & Loflin for defendant appellant.*

SHARP, Chief Justice.

The first assignment of error which defendant brings forward on appeal to this Court is that the trial judge erred in overruling his motion for judgment of nonsuit on all counts in the "Information and Waiver of Indictment." We consider first his contention that the evidence was insufficient to establish a conspiracy among him, Montgomery and Moon to set fire to the Mayor's bushes or fence as charged in the first count. Upon a motion for nonsuit in a criminal action, the court considers the evidence in the light most favorable to the State, resolves all contradictions and discrepancies therein in its favor, and gives it the benefit of every reasonable inference which can be drawn from the evidence. *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679 (1967). The State contends that when the evidence is evaluated under the foregoing rule it survives the motion, and we agree.

[1, 2] A criminal conspiracy is an agreement between two or more persons to do an unlawul act or to do a lawful act in an unlawful way or by unlawful means. *State v. Littlejohn,* 264 N.C. 571, 142 S.E. 2d 132 (1965). To constitute a conspiracy it is not necessary that the parties should have come together and agreed in *express* terms to unite for a common object: " 'A

mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense.' " *State v. Smith,* 237 N.C. 1, 16, 74 S.E. 2d 291, 301 (1953), quoting *State v. Connor,* 179 N.C. 752, 103 S.E. 79 (1920). The conspiracy is the crime and not its execution. *State v. Lea,* 203 N.C. 13, 164 S.E. 737 (1932). Therefore, no overt act is necessary to complete the crime of conspiracy. As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed. *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334 (1964).

[3, 4]   Once a conspiracy has been shown to exist the acts and declarations of each conspirator, done or uttered in furtherance of a common illegal design, are admissible in evidence against all. *State v. Gibson,* 233 N.C. 691, 65 S.E. 2d 508 (1951) ; *see State v. Goldberg, supra; State v. Summerlin,* 232 N.C. 333, 60 S.E. 2d 322 (1950). The existence of a conspiracy may be established by direct or circumstantial evidence. To this end the unsupported testimony of a co-conspirator is sufficient to sustain a verdict, although the jury should receive and act upon such testimony with caution. *State v. Horton,* 275 N.C. 651, 170 S.E. 2d 466 (1969) ; *State v. Tilley,* 239 N.C. 245, 79 S.E. 2d 473 (1954). However, "[d]irect proof of the charge [conspiracy] is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside,* 204 N.C. 710, 712-13, 169 S.E. 711, 712 (1933).

[5]   Applying the foregoing principles of law, the evidence in this case is sufficient to establish the following facts which point unerringly to the existence of a conspiracy.

In June 1974, the Board of Aldermen of Gibsonville were considering whether to dismiss defendant as the Town's Chief of Police. In consequence, defendant was upset and resentful, especially toward the Mayor and Mayor Pro Tem, both of whom favored his dismissal. Defendant and Montgomery, a police sergeant who worked under him, were good friends. Defendant had given Montgomery a key to his house and Montgomery came and went at will, staying there whenever he chose. In early June defendant discussed with Montgomery his uncertain tenure as Chief of Police. He told Montgomery he might need help in retaining his position.

State v. Bindyke

On June 3rd defendant told Montgomery to send Gregory Moon, a friend of defendant and Montgomery's "good friend," to his home. Montgomery delivered the message to Moon and that same afternoon the three men met at defendant's home and "talked." Defendant was upset with the Aldermen and the Mayor, and discussed with Montgomery and Moon various scare tactics which he had used in Pennsylvania. These included threatening telephone calls, throwing rocks through windows, sending "the target" a coffin, and hanging dummies in his yard. On June 4th, pursuant to Montgomery's direction, Moon telephoned defendant. Defendant told him he was getting tired of harassment from the Board and the Mayor; that they needed some pressure put on them; and that he had in mind a bomb. Moon said he would be willing to help and that he would keep in touch with defendant through their mutual friend, Montgomery. After this conversation Moon began to harass the Mayor. He threw two socks filled with rocks through the Mayor's picture window, reported a false case of "drug overdose" and ordered an ambulance sent to his home. He also had a load of concrete delivered there. Moon reported all his activities to defendant, who was both pleased and amused.

Sometime during the week of June 4th defendant promised Moon that those involved in the activities against the Mayor and Aldermen would "be given amnesty" and that they "could more or less run the town" without fear of retribution. On 9 June defendant told Montgomery he didn't believe the Mayor was scared enough and he "needed a fire in his bushes or on his fences." The next day, June 10th, Montgomery related to Moon just exactly what defendant had said and then drove Moon by the Mayor's home to show him its location. On this trip they spotted the Mayor's 1967 Buick parked in the driveway.

The circumstances which confronted defendant in June 1974; his decision to try to save his position as Chief of Police by terrorizing the Mayor and Mayor Pro Tem; the fact that he had engaged Montgomery and Moon to execute his scare tactics; and that they had already begun to implement his suggestions, create a strong inference that the conspiracy charged in the first count was complete when Montgomery, pursuant to defendant's direction, "passed the word" to Moon that Mayor Younger might "need a fire in his bushes or on his fence" and Montgomery then drove Moon by the Mayor's house to show him where the Mayor lived. Direct proof of a con-

spiracy is not essential or often obtainable, for the parties to it do not put their agreement in writing; nor do they discuss it in the formal language of contracts. However, " '[a]s soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed.' . . . [T]he situation of the parties and their antecedent relations to each other, together with the surrounding circumstances, and the inferences legitimately deducible therefrom, furnish, in the absence of direct proof, and often in the teeth of positive testimony to the contrary, ample ground for concluding that a conspiracy exists." *State v. Whiteside, supra* at 712-13, 169 S.E. at 711, 712. Based upon the foregoing evidence, there can be no doubt that there was at least a tacit and implied agreement among defendant, Moon and Montgomery to burn the Mayor's property. The fact that neither bushes nor fences were actually burned is immaterial to the existence of the conspiracy. *See State v. Goldberg, supra.*

**[6]** Defendant's second contention is that no evidence in the record indicates that he knew about, approved of, or assisted Moon in his attempt to burn the Mayor's car by the use of an incendiary device. In support of this contention, defendant points to the fact that Montgomery testified that the idea to firebomb the car originated when he drove Moon by the Mayor's house. According to Montgomery's testimony Moon, upon seeing the Buick parked in the driveway, said he would "go for" it with a Molotov cocktail. The inference from Montgomery's testimony—so defendant contends—is that Moon formulated the plan to attack the car and defendant was unaware of this specific activity. From this, defendant further argues that since there is no evidence he participated in a conspiracy to burn the Mayor's fences or bushes, he cannot be held "vicariously liable" for an act "which Moon thought up himself and carried out without any assistance or even prior knowledge of the defendant." We necessarily reject this contention, having concluded that the evidence is sufficient to establish a conspiracy to terrorize and coerce the Mayor and Mayor Pro Tem by burning the Mayor's bushes and fences, throwing rocks through windows, and making telephone calls threatening fire. *See* 4 W. Blackstone's Commentaries *143.

Defendant correctly concedes that, once a conspiracy is shown, each conspirator "is responsible for all acts committed by the others in the execution of the common purpose which

are a natural or probable consequence of the unlawful combination or undertaking, even though such acts are not intended or contemplated as a part of the original design." *State v. Smith,* 221 N.C. 400, 405, 20 S.E. 2d 360, 364 (1942). *See also State v. Brooks,* 228 N.C. 68, 44 S.E. 2d 482 (1947). "Conspiracy implies concert of design and not participation in every detail of execution, and it is not necessary that each conspirator should have taken part in every act, or known the exact part performed or to be performed by the others in the furtherance of the conspiracy." 15A C.J.S. *Conspiracy* § 40 (1967). "The act of one conspirator done in the effort to achieve the main object of the criminal plan will be imputed to the other even if the other was not present and the act deviates from the agreed-upon method of perpetration. . . . [However,] if one conspirator unexpectedly goes entirely outside the purpose of the combination to commit a crime he alone is guilty thereof." R. Perkins, Criminal Law Ch. 6, § 5 at 633-34 (2d Ed. 1969).

We have no doubt that the attempted firebombing of the Mayor's automobile in the driveway beside his house was done in furtherance of the basic purpose of the conspiracy, which was to intimidate the Mayor and Mayor Pro Tem by damaging their real and personal property and by general threats of fire. Thus, even if defendant were correct in asserting that there was no evidence to indicate that he knew about the firebombing or participated in it, defendant, would, nonetheless, be criminally responsible for the attempted firebombing, since it was a natural and foreseeable consequence of the conspiracy which he had entered.

An alternate basis for our conclusion that the trial judge correctly denied defendant's motion to dismiss the second count is that, in our view, the evidence is sufficient to support a finding that defendant actually formulated and knew about the plan to firebomb the Mayor's vehicle. As defendant correctly points out Montgomery testified that this idea was Moon's alone. Defendant, however, ignores the fact that Moon testified that Montgomery told him that defendant wanted him "to firebomb the 1967 Buick parked in the driveway." In addition, both Moon and Montgomery testified that a little after 9:00 p.m. Montgomery advised Moon the Buick was still in the Mayor's driveway. Moon and Bobby Glenn proceeded to make a firebomb while Montgomery went to the home of defendant, where they "just sat there and talked."

From the foregoing evidence the jury could legitimately conclude that defendant had transmitted to Moon through Montgomery his direction to bomb the Mayor's car and that Montgomery had informed defendant Moon would do as directed. Under this evidence the unlawful agreement of defendant and the others encompassed the very act that was done, and defendant is therefore criminally responsible for it regardless of whether the attempted burning of the car was a foreseeable consequence of the more restricted conspiracy charged in the first count of the information.

[7] Defendant's next contention is that the court should have granted his motion to nonsuit the third count in the information, which charges that defendant "unlawfully, wilfully and feloniously did aid and abet Gregory Moon, Danny Moore, Bobby Howard Glenn and Stephen Montgomery in the malicious damage to the real property of W. Hal Laughlin, 521 Ossippee Road, Gibsonville, North Carolina, by the use of incendiary material . . . setting fire to the front yard lawn after said gasoline had been placed on it." Defendant concedes that the State's evidence tends to show that the fire in Laughlin's yard was defendant's idea; that it was accomplished according to his plan; that defendant supplied the gasoline for the fire; and that he himself created a diversion to distract attention from the Laughlin premises at the time the fire was set. His contention is that the information charges him with aiding and abetting the burning of Laughlin's lawn; that the evidence tends to show he was an accessory before the fact to the crime in that he was not present at the burning; and that the discrepancy between the allegation and proof constitutes a fatal variance. We find no merit in this contention for the following reason:

Although the third count charges that defendant feloniously aided and abetted others in maliciously damaging real property by the use of incendiary material—a felony under G.S. 14-49(b)—the trial judge submitted the issue of the jury on the theory that defendant's conduct was a violation of G.S. 14-127, a misdemeanor. In this State, as in all common law jurisdictions, "[t]he distinction between principals and accessories is made only in felonies. All persons who participate in treason or in misdemeanors, whether present or absent, are indictable and punishable as principals." *State v. Bennett,* 237 N.C. 749, 752, 76 S.E. 2d 42, 43 (1953). Thus, if the information was sufficient to support a conviction under G.S. 14-127 there could be no fatal variance.

G.S. 14-49 (b), under which the third count was drawn, provides: "Any person who wilfully and maliciously damages or attempts to damage any real or personal property of any kind or nature belonging to another by the use of any explosive or incendiary device or material is guilty of a felony."

G.S. 14-127 provides: "If any person shall wilfully and wantonly damage, injure or destroy any real property whatsoever, either of a public or private nature, he shall be guilty of a misdemeanor and shall be punished by fine or imprisonment or both, in the discretion of the court."

Although the language of the third count in the information does not follow exactly the language of either G.S. 14-49 (b) or G.S. 14-127, it does allege specific acts which would constitute a violation of either section. "The fact that an indictment fails to follow the language of the statute, or fails to specify the statute under which it was drawn, is not a vitiating defect if the pleading charges facts sufficient to enable the court to proceed to judgment." 4 Strong's N. C. Index 2d *Indictment and Warrant* § 9 (1968). We hold that *upon the facts here* the third count charging a violation of G.S. 14-49 (b) also embraces a charge under G.S. 14-127 and therefore supports the verdict. *Id.* § 18.

For the reasons stated defendant's first assignment of error is overruled.

We note that under the evidence, defendant, as a party to the conspiracy to burn Laughlin's yard, was equally guilty with the other participants as a principal. However, this was not the theory upon which the solicitor drew the third count of the information. We also note that in sentencing defendant upon the second count, a felony for which the punishment prescribed is imprisonment in the State's prison for not less than five nor more than thirty years, Judge Chess only imposed a sentence of two to three years.

Defendant's final assignment of error raises the question whether the judge's inadvertent violation of G.S. 9-18 in failing to dismiss the alternate juror who remained in the jury room from three to four minutes after the jury retired to consider its verdict, nothing else appearing, infringed his right to trial by jury as guaranteed by N. C. Const. art. I, § 24. At the outset we note (1) that the judge summarily recalled and dismissed the alternate without making any effort whatever to

ascertain whether the jury had begun its deliberations; and (2) that defense counsel did not move for a mistrial on this ground then or later.

In pertinent part, N. C. Const. art. I, § 24 provides: "No person shall be convicted of any crime but by the unanimous verdict of a jury in open court. The General Assembly may, however, provide for other means of trial for misdemeanors, with the right of appeal for the trial de novo."

N. C. Gen. Stat. § 9-18 provides for the selection of one or more alternate jurors after the regular jury has been impaneled so that if, before the case is submitted to the jury, a juror dies, becomes unable or disqualified to serve, or is discharged for any reason, an alternate may be substituted in his stead. If he has not been substituted and becomes a part of the regular panel, the statute requires that "[a]n alternate juror . . . shall be discharged upon the final submission of the case to the jury."

Many decisions evidence this Court's commitment to preserving inviolate the right of trial by jury as at common law.

In *Whitehurst v. Davis,* 3 N.C. (2 Haywood's Law & Equity) 113 (1800), the error assigned was that a caveat had been tried by thirteen jurors. In awarding a new trial the Court said: "It may be said, if 13 concur in a verdict, 12 must necessarily have given their assent. But any innovation amounting in the least degree to a departure from the ancient mode may cause a departure in other instances, and in the end, endanger or prevent this excellent institution from its usual course: therefore, no such innovation should be permitted."

In *State v. Alston (and Battle),* 21 N.C. App. 544, 204 S.E. 2d 860 (1974), the defendants were tried jointly upon identical indictments charging felonies. A thirteenth juror was selected and seated as an alternate. When the case was submitted to the jury all thirteen jurors retired, deliberated, and returned verdicts of guilty as charged. The Court of Appeals ordered a new trial upon the authority of *Whitehurst v. Davis, supra.*

In *State v. Dalton,* 206 N.C. 507, 174 S.E. 422 (1934), in holding the alternate juror statute (G.S. 9-18, enacted as N. C. Sess. Laws, ch. 103 (1931)) constitutional, the Court pointed out that it preserved all the essential attributes of the common law jury system, including the number of jurors, since the alternate becomes a juror only when the judge, for cause, substitutes

him for a member of the original panel. "From the beginning to the end of the trial the number never varies, and, by a jury of twelve men the verdict is declared." *Id.* at 512, 174 S.E. at 425. Here we note that it required a constitutional amendment (passed at the general election of 1946) to make the women of the State eligible for jury service. *See State v. Emery,* 224 N.C. 581, 31 S.E. 2d 858 (1944) ; N. C. Sess. Laws, ch. 634 (1945) ; N. C. Const. art. I, § 26.

An unbroken line of North Carolina cases hold that in felony trials the accused must be tried by a jury of twelve and he cannot consent to a lesser number. The rule is stated and authorities cited in *State v. Hudson,* 280 N.C. 74, 185 S.E. 2d 189 (1971).

[8, 9] Thus, there can be no doubt that the jury contemplated by our Constitution is a body of twelve persons who reach their decision in the privacy and confidentialty of the jury room. There can be no question that the presence of an alternate juror in the jury room after a criminal case has been submitted to the regular panel of twelve is always error. The requirements of G.S. 9-18 and N. C. Const. art. I, § 24, and similar statutes and constitutional provisions in other jurisdictions, are mandatory. The question is whether this error is prejudicial *per se* or are there circumstances under which it can be considered harmless?

The rule formulated by the overwhelming majority of the decided cases is that the presence of an alternate, either during the entire period of deliberation preceding the verdict, *or* his presence at any time during the *deliberations* of the twelve regular jurors, is a fundamental irregularity of constitutional proportions which requires a mistrial or vitiates the verdict, if rendered. And this is the result notwithstanding the defendant's counsel consented, or failed to object, to the presence of the alternate. *See United States v. Beasley,* 464 F. 2d 468 (10th Cir. 1972) ; *United States v. Virginia Erection Corporation,* 335 F. 2d 868 (4th Cir. 1964) ; *People v. Britton,* 4 Cal. 2d 622, 52 P. 2d 217 (1935) ; *People v. Adame,* 36 Cal. App. 3d 402, 111 Cal. Rptr. 462 (1973) ; *People v. Bruneman,* 4 Cal. App. 2d 75, 40 P. 2d 891 (1935) ; *Berry v. State,* 298 So. 2d 491 (Fla. 4th Dis. Ct. of App. 1974) ; *Glenn v. State,* 217 Ga. 553, 123 S.E. 2d 896 (1962) ; *State Highway Comm. v. Dunks,* \_\_\_\_ Mont. \_\_\_\_, 531 P. 2d 1316 (1975) ; *People v. King,* 13 N.Y. App. Div. 2d 264, 216 N.Y.S. 2d 638 (1961) ; *Brigman v. State,* 350 P. 2d 321 (Okla. Crim. App. 1960) ; *Commonwealth v. Krick,* 164

Pa. Super. 516, 67 A. 2d 746 (1949); *State v. Cuzick,* 85 Wash. 2d 146, 530 P. 2d 288 (1975); Annot., *Alternate or Additional Jurors,* 84 A.L.R. 2d 1288, 1312-14 (1962); 50 C.J.S. *Juries* § 123 c. & d. (1947).

We have found the California decisions cited above particularly instructive. In *People v. Bruneman,* 4 Cal. App. 2d 75, 40 P. 2d 891 (1935), two alternates, instructed to listen but not to discuss the case in any way, retired with the jury to the jury room with the consent of the defendant's counsel. They remained with the jury until its verdict was returned. On appeal, the court granted the defendant a new trial on the ground that the California Constitution guaranteed him the right of trial by jury as the right existed at common law, and one of the essential characteristics of the common law jury is "that twelve persons, not more nor fewer, shall pass upon the issues of fact." *Id.* at 79, 40 P. 2d at 893. The court also emphasized the common law tenet "that the jury are entitled, and bound, to deliberate in private," and that, under it, the presence of the two alternates was an intrusion upon the privacy and confidence of the jury room, "tending to defeat the purpose for which they were sent out." Their presence was "an error so far destructive" of their right to trial by jury that it could not be cured by the consent of defendant's attorney. *Id.* at p. 81, 40 P. 2d at 893. Accord, *People v. Britton,* 4 Cal. 2d 622, 52 P. 2d 217 (1935).

In *People v. Adame,* 36 Cal. App. 3d 402, 111 Cal. Rpt. 462 (1973), the California Court of Appeal again considered the issue. In *Adame,* the alternate juror retired with the jury and was present for one hour and forty minutes while the jury deliberated. Upon learning of her presence the trial judge immediately removed her, and the jury continued its deliberations until they were sent home for the night. The next day, having deliberated a total of four and one half hours, the jury returned its verdict. The trial court, having concluded that the presence of the alternate during the jury's deliberations constituted prejudicial error of constitutional stature, granted defendant a new trial, and the State appealed. Relying on *Britton* and *Bruneman,* the Court of Appeal affirmed the trial judge's ruling. The State had sought to distinguish *Bruneman* and *Britton* on the basis that those cases involved the presence of the alternate in the jury room during the entire period of deliberation and the reaching of a verdict, whereas in *Adame* the alternate was present in the jury room for only an hour and forty minutes of the

four and one half hours of deliberation. The court said, "This argument suggests that early deliberations of the jury are of less significance to the verdict than later deliberations. Not only is appellant's position untenable insofar as suggesting that the jury's early deliberations are disrelated to its ultimate decision, but it is entirely contrary to the *ratio decidendi* of *Bruneman* and *Britton*. These cases in substance declare that it is the very sanctity of the jury room with only the regular jurors present which is protected by Article I, Section 7 of the State Constitution." *Id.* at 408, 111 Cal. Rptr. at 465.

In a footnote, the California Court said that in any hearing to determine prejudice the defendant should not be forced to rely on the memory of an alternate juror as to what transpired in the jury room. It noted that this problem was particularly apparent in *Adame* where the alternate testified, "I think I was in there around five to ten minutes until the bailiff came and got me out. It might have been a little longer than that." In fact, she was in the jury room for approximately one hour and forty minutes. *Id.*, n. 4 at 407, 111 Cal. Rptr. at 465.

In *United States v. Beasley, supra,* the alternate juror retired with the original twelve and remained with them for twenty minutes before the court removed her. Upon defendant's motion for a mistrial the judge conducted a hearing and ascertained that during the twenty minutes the thirteen had elected a foreman and then voted to go to lunch. The judge found "no prejudice" and denied the motion. In considering defendant's appeal from a conviction, the United States Court of Appeals for the Tenth Circuit said "the authorities on this point" presented the trial judge with two alternatives: (1) He could conduct a hearing, question the jurors, or some of them, to see how far their deliberations had progressed and how the alternate juror had participated therein and thus attempt to determine whether any prejudice to the defendant had occurred; or (2) he could proceed on the assumption that a mistrial was required if the alternate participated in any proceeding commenced by the jury itself after it retired to deliberate.

In rejecting the first alternative the court reasoned: (1) To provide or apply an appropriate standard or test of prejudice could be "difficult"; (2) An inquiry at a hearing under a standard which requires a showing of prejudice would itself be a dangerous intrusion into the proceedings and privacy of the jury; and (3) The purpose sought to be achieved at such

a hearing is not of sufficient importance to warrant such an inquiry in comparison to the possible harm or appearance of interference.

The decision in *Beasley* was that the trial court's "inquiry is limited to determining whether the jury had begun its function as a separate entity. The facts here show that this point had been passed and the alternate was present. Thus a mistrial is necessary." *Id.* at 471.

In *State v. Cuzick, supra,* the Supreme Court of Washington also rejected the alternative of a factual inquiry into the extent of the alternate juror's participation in the deliberations on the ground that it would be unlikely to shed much light on the actual effect of the alternate's presence in the jury room. The court reasoned (1) that it would be impossible to recreate every move, every expression he might have made during the time he was in the jury room; (2) that even if it were possible to determine exactly what he did or said, it could not be known how or whether his actions affected the others; and (3) that the primary effect of such an inquiry would be to further invade the jury room and impose on those who served in it.

In *Commonwealth v. Krick, supra,* the defendant appealed his conviction, assigning as error that the trial judge, at the time he submitted the case to the jury, had permitted two alternate jurors to retire with the twelve to the jury room where they remained for ten minutes before they were withdrawn. The appellate court considered defendant's appeal as based on the denial of a constitutional right and awarded a new trial. The court said it could not be known whether the alternates deliberated with the jurors during those ten minutes or in any way influenced the verdict. The court reasoned, however, that to have allowed the alternates *any* opportunity to deliberate with the others was a direct violation of the Act which forbade alternates to "retire with the jury of twelve after the case is submitted to it." *Id.* at 521, 67 A. 2d at 749.

At least one court does not agree with the majority view, delineated in the authorities cited and discussed above, that the presence of an alternate during the jury's deliberations automatically necessitates a new trial. This court, although recognizing that such presence is error, requires the defendant to show prejudice from the actions or presence of the alternate juror. To provide a defendant this opportunity the trial court is re-

quired to hold a hearing to determine what transpired in the jury room during deliberations. This was the conclusion reached and the procedure followed in *United States v. Allison,* 481 F. 2d 468 (5th Cir. 1973), *cert. denied,* 416 U.S. 982, *hearing aff'd.,* 487 F. 2d 339. As authority for its decision the court in *Allison* cited *United States v. Nash,* 414 F. 2d 234 (2nd Cir. 1969), *cert. denied,* 396 U.S. 940 and *United States v. Hayutin,* 398 F. 2d 944 (2nd Cir. 1968), *cert. denied,* 393 U.S. 961. These two cases involved factual situations differing from that of *Allison.* In *Nash* and *Hayutin* the alternates were never in the presence of the jury in the jury room during deliberations.

After considering the decisions expounding both the majority and minority views we are constrained to adopt the majority rule and hold that the presence of an alternate in the jury room during the jury's deliberations violates N. C. Const. art. I, § 24 and G.S. 9-18 and constitutes reversible error *per se.* We find the rationale upon which this rule is based irrefutable: (1) Participation of an alternate in the deliberations of the jury negates a defendant's right to trial by jury as it existed at common law, that is, by a jury of twelve in the inviolability, confidentiality and privacy of the jury room. (2) Public policy and practical considerations preclude any hearing to determine whether the alternate's presence in the jury room during deliberations affected the jury's verdict or prejudiced the defendant in that (a) any such hearing would necessarily be inconclusive because no adequate standards can be devised for determining whether the alternate's presence affected the jury; (b) upon a hearing in which a defendant attempts to show prejudice he would have to rely upon either the testimony of the alternate juror, members of the panel or both; and (c) an inquiry into what transpired in the jury room during the alternate's presence itself invades the sanctity, confidentiality, and privacy of the jury process and gives the appearance of judicial interference with the jury.

We cannot adopt a rule which would allow the trial judge to attempt to determine whether the alternate was present in the jury room a "substantial" length of time during deliberations or had participated in the deliberations to defendant's prejudice. Where would the court draw the line between insubstantial and substantial presence? In *Beasley* the court held that presence for twenty minutes invalidated the verdict; in *Krick,* ten minutes voided the trial. We hold that at any time an alternate is in the

State v. Bindyke

jury room *during deliberations* he participates by his presence and, whether he says little or nothing, his presence will void the trial.

There is, however, no substitute for common sense, and the foregoing rule has no application where the alternate's presence in the jury room is inadvertent and momentary, and it occurs under circumstances from which it can be clearly seen or immediately determined that the jury has not begun its function as a separate entity. In *People v. Rhodes*, 38 Ill. 2d 389, 231 N.E. 2d 400 (1967), at the time the original twelve retired, the alternate went into the jury room for the sole purpose of obtaining her coat before leaving the courtroom, and she left before deliberations began or the foreman was chosen. The Illinois Supreme Court sensibly held that the fact "the alternate juror was allowed to remove her coat from the jury room could at the most extreme characterization be considered as an irregularity and is not sufficient to require a reversal of his [defendant's] conviction." *Id.* at 395, 231 N.E. 2d at 403.

The California Supreme Court has also held that the momentary presence of an alternate in the jury room immediately after the jury has retired, and under circumstances which negate the beginning of its deliberations, will not invalidate the verdict. *People v. French*, 12 Cal. 2d 720, 87 P. 2d 1014 (1939).

Obviously, once the jury has retired to the jury room and shut the door, the judge—to whom the jury room is off limits—cannot know for certain when deliberations have begun. After the jury has been "out" for a "substantial" length of time, it must be assumed that it has begun the business for which it was impaneled. Yet, as all trial judges and courtroom personnel know, it would be a rare case in which the jurors begin their deliberations the instant the last member is inside the jury room and the door is closed. If the judge's charge was a lengthy one, or if the jury has been sitting continuously for an appreciable length of time before retiring, each juror would most likely want to make himself comfortable before beginning the decision process. The length of time this would require would depend upon many variables and differ from case to case.

[9] During that relatively short period, however, if the inadvertent presence of the alternate in the jury room is discovered, and no deliberations have begun before he is removed, his mere temporary presence would not invalidate the trial. There-

fore, if the judge, from his trial experience and knowledge of the circumstances of the particular case, believes it probable that the jury has not begun its consideration of the evidence, he may properly recall the jury and the alternate and, in open court, inquire of them whether there had been *any* discussion of the case. If the answer is No, the alternate will be excused and the jury returned to consider its verdict. If the answer is YES, there must be a mistrial. No inquiry into the extent or nature of the deliberations is permissible.

In our view, in this case, the trial judge could have properly conducted this limited inquiry. However, he did not do so. The Court of Appeals, after noting that the judge removed the alternate from the jury room "after only three or four minutes had elapsed," adjudicated that "the alternate did not participate in the deliberation and verdict of the other twelve. His brief visit to the jury room was not prejudicial." *State v. Bindyke*, 25 N.C. App. 273, 277, 212 S.E. 2d 666, 668 (1975).

This assumption, unsupported by any evidence in the record, cannot be sustained. It is quite possible that one or more jurors, including the alternate, had expressed an opinion as to defendant's guilt or innocence, or commented on the evidence. If so, as pointed out in *Adams, supra*, it cannot be assumed that observations and discussions which take place during the first few minutes after the jurors retire are less significant to the verdict than later deliberations.

As much as we regret the necessity of imposing upon the State the penalty of a retrial of this case we are persuaded that higher considerations require it, and that the rule which we have adopted will, in the long run, create certainty and promote judicial economy. That rule, as previously stated is this: The presence of an alternate juror in the jury room at any time during the jury's deliberations will void the trial. The alternate has participated by his presence; and the court will conduct no inquiry into the nature or extent of his participation. However, if through inadvertence, the alternate retires with the jury at the time the case is submitted to it, and his presence in the jury room is discovered so promptly that the trial judge believes it probable no deliberations have begun, he may recall the jury and the alternate and make the limited inquiry whether there has been any discussion of the case or comment with reference to what the verdict should be. If the answer is YES, the

judge must declare a mistrial; if the answer is No, the jury will retire to begin its deliberations.

Finally, we would impress upon the trial judges that the requirement of the alternate jurors be discharged before the final submission of the case to the jury should be strictly observed. The most elementary precautions will prevent an alternate from entering the jury room upon the panel's retirement to deliberate, and surely this case proves that these precautions should be taken.

Since the case must be retried, we refrain from dicussing the other assignments of error; they are not likely to reoccur. The case is returned to the Court of Appeals with instructions to remand the cause to the Superior Court for a

New trial.

Justice HUSKINS dissenting.

Analysis of the decisions cited in the majority opinion leads me to conclude that defendant's conviction should be upheld.

Basically, the authorities relied on by the majority hold that a new trial is required if the alternate juror is present *during deliberations* of the jury. There is nothing in this record to support the notion that any deliberations had taken place during the brief presence of the alternate juror. Indeed, all the attendant circumstances suggest the contrary.

The trial of this case consumed the better part of three days. The case itself involves conspiracy, the law dealing with malicious attempts to damage personal property, and aiding and abetting such offenses. Following the charge to the jury dealing with these difficult legal principles, the trial judge inadvertently allowed the alternate juror to retire to the jury room with the twelve. After "three or four minutes" the jury and alternate were recalled to the courtroom and the alternate was dismissed. The jury returned to the jury room and ultimately rendered a verdict of guilty on all counts. The majority holds that the presence of the alternate juror in the jury room "during the jury's deliberations" violates Article I, section 24 of our Constitution and G.S. 9-18 and constitutes reversible error *per se*. To my way of thinking, that holding violates the following quotation from the majority opinion: "There is, how-

State v. Bindyke

ever, no substitute for common sense, and the foregoing rule has no application where the alternate's presence in the jury room is inadvertent and momentary, and it occurs under circumstances from which it can be clearly seen or immediately determined that the jury had not begun its function as a separate entity."

The circumstances negate the majority's assumption that the jury had begun its deliberations during the brief presence of the alternate juror. This conclusion is supported by common knowledge that jurors rarely begin their deliberations the instant the last juror enters the jury room and the door is closed. Reason dictates that this jury, after a three-day trial and a lengthy charge, spent the first three or four minutes after it retired "making itself comfortable," lighting up a cigarette, and inspecting the coffee pot. These preliminaries ordinarily consume more than four minutes. Few restrooms will accommodate twelve people simultaneously. Thus, application of reason to the facts and circumstances impels the conclusion drawn by the Court of Appeals that the alternate juror did not participate in the deliberations and verdict of the jury and "his brief visit to the jury room was not prejudicial."

Defendant's co-conspirators pled guilty to one charge of malicious damage to personal property by the use of an incendiary device, testified for the State in this case, and each is now serving a prison sentence of two to three years. Proof of this defendant's guilt is overwhelming.

Despite overcrowded dockets, our courts are faced with ever-increasing demands for speedy trials, and I am unwilling to impose upon the State and the courts the penalty of a retrial of this case. In my view defendant has had a fair trial free from prejudical error. The record shows that at the time the trial judge recalled the jury and dismissed the alternate he consulted with prosecution and defense counsel at the bench. Defendant raised no objection based on the inadvertence and made no motion for a mistrial. This suggests that defendant regarded the brief presence of the alternate juror as harmless and perceived no prejudice to his cause. He should not be permitted now to assume a different stance. Moreover, it is my view that the trial judge should never declare a mistrial based upon the inadvertent presence of the alternate juror, even after limited inquiry as to whether there has been any discussion of the case, unless defendant either seeks or consents to a mistrial.

Otherwise, a plea of double jeopardy upon retrial may present serious problems.

For the reasons stated, I respectfully dissent from the majority opinion and vote to affirm the decision of the Court of Appeals.

Justices COPELAND and EXUM join in this dissent.