An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-442
NORTH CAROLINA COURT OF APPEALS

Filed:  18 November 2014

STATE OF NORTH CAROLINA

v.                               Buncombe County
                                 No. 13 CRS 051036
JOSHUA WINKLER


Appeal by Defendant from judgment entered 7 November 2013 by Judge Bill Coward in Superior Court, Buncombe County.  Heard in the Court of Appeals 25 September 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Barry H. Bloch, for the State.*

> *Cooley Law Office, by Craig M. Cooley, for Defendant-Appellant.*

McGEE, Chief Judge.

Joshua Winkler ("Defendant") appeals from a judgment entered upon a jury verdict finding him guilty of conspiring to traffic in opium or heroin by transporting in excess of four grams but less than fourteen grams of a mixture containing Oxycodone, which is a Schedule II controlled substance under N.C. Gen. Stat. § 90-90(1)(a)(14).  We vacate the trial court's

judgment.

The evidence presented at trial tended to show that, in January 2013, Probation and Parole Officer Melissa Whitson ("Officer Whitson") received information that Jamie Harris ("Mr. Harris"), a probationer under her supervision through the Buncombe County Drug Treatment Court, was selling Oxycodone in exchange for rides. Officer Whitson contacted Mr. Harris on 16 January 2013 and requested that he visit her office. After he arrived at the office, Mr. Harris was administered a drug test, which yielded a positive result for Oxycodone. Officer Whitson and two other officers then accompanied Mr. Harris to 83 Dix Creek Chapel Road in Asheville, North Carolina — a residence in which Mr. Harris had been staying "some" and to which he would soon be permanently moving — in order to search the residence.

Upon conducting their search, the officers found drug paraphernalia, needles, a spoon with a partially melted pill, tourniquets, and a firearm. As Officer Whitson walked into the living area to discuss some information with one of the other officers at the scene, a mail carrier knocked at the door to deliver a package. The package was addressed to "Jamie Harris, 83 Dix Creek Chapel Road, Asheville, North Carolina 28806," and was sent from "J. Winkler, 1219 Everglades Avenue, Clearwater,

Florida 33764." Mr. Harris "seemed nervous" when the package arrived. At the officers' request, Mr. Harris consented to open the package in front of them. Inside the package was an unlabeled pill bottle that contained sixty pills and a tissue "stuffed down" into the bottle. Mr. Harris was then arrested and charged with trafficking in opium. The pills seized from Mr. Harris's residence were later tested by a forensic scientist with the North Carolina State Crime Laboratory, who determined that the pills contained Oxycodone, a Schedule II opium derivative.

While Mr. Harris was in jail, Officer Tammy Bryson ("Officer Bryson") and another officer with the Asheville Police Department began monitoring Mr. Harris's telephone conversations. Officer Bryson was assigned to the Buncombe County Anti-Crime Taskforce as an undercover drug agent. Officer Bryson primarily investigated "drug diversion" cases — cases in which legal drugs, e.g., prescription medications, were used illegally or were used in a manner in which the medications were not prescribed. In a call recorded the day after Mr. Harris's arrest, the officers "heard the name 'Josh' come up" and heard that he was "in town," which prompted them to start investigating whether "Josh" was the "J. Winkler" who had sent the package of unlabeled pills to Mr. Harris. The officers

learned that Defendant — Joshua Winkler — had a North Carolina driver's license with a Farmville, North Carolina address, as well as a Florida driver's license. After conducting surveillance of Mr. Harris's residence for several days, Officer Bryson observed a vehicle parked at Mr. Harris's residence that officers determined was registered to Defendant at his Farmville, North Carolina address. Defendant was seen leaving Mr. Harris's residence on 28 January 2013, and an officer executed a stop of Defendant's vehicle.

Officer Bryson and another officer arrived at the scene and asked Defendant to speak with them about the package he had sent to Mr. Harris. The officers escorted Defendant to their vehicle, where Defendant joined Officer Bryson in the front seat. After Officer Bryson advised Defendant of his rights, Defendant executed a rights' advisement form and consented to speak with Officer Bryson and the other officer.

Officer Bryson testified that Defendant admitted the Oxycodone pills he sent to Mr. Harris through the mail belonged to Defendant, and that Defendant received and filled his prescription for the pills in Florida. According to Officer Bryson, Defendant said he lived in Farmville, North Carolina, but visited a doctor in Miami, Florida, to get his prescription for Oxycodone, because Defendant's local North Carolina

physician was unwilling to prescribe Defendant Oxycodone due to his probationary status that was said to have resulted from an arrest for "doctor shopping."[1] Defendant told Officer Bryson that Mr. Harris's son was his grandson, and said that he was returning to North Carolina from Florida to visit Mr. Harris's son and other grandchildren who lived in the area. Defendant also said he "did not want to travel with his pills on him," so he sent his pills through the mail to Mr. Harris's address, since Defendant was going to visit Mr. Harris's residence to see his grandson.

Officer Bryson testified Defendant told her "he knew that Mr. Harris did pills and sold pills." Officer Bryson further testified that Defendant was unable to give her an answer as to why he chose to send his Oxycodone pills to Mr. Harris "knowing that [Mr. Harris] was a drug dealer and . . . used drugs and why [Defendant] sent them to [Mr. Harris] in a plain pill bottle with no label and tissue stuffed in it." Officer Bryson also testified that Oxycodone pills were regularly the subject of drug diversion cases, and that perpetrators of drug diversion offenses often used unlabeled pill bottles to deliver or

---

[1] Officer Bryson described "doctor shopping" as an offense in which someone obtains or seeks a prescription from a health care practitioner while being supplied with another prescription by another practitioner without disclosing the fact of the former prescription to the practitioner from whom the subsequent prescription is sought.

transport the pills and wedged tissues into the bottles in order to keep the pills from rattling around inside the bottles. Defendant also told Officer Bryson he thought he would arrive at Mr. Harris's residence before the pills did. Officer Bryson then placed Defendant under arrest.

Defendant was indicted for conspiring with Mr. Harris to traffic in opium or heroin by transporting in excess of four grams but less than fourteen grams of a mixture containing Oxycodone. At trial, Defendant presented no evidence, and moved to dismiss the charge at the close of the State's evidence and at the close of all of the evidence. Defendant's motions were denied. Defendant was found guilty by a jury of the charged offense, and was sentenced to a term of seventy to ninety-three months imprisonment. Defendant appeals.

Defendant first contends the trial court erred by denying his motions to dismiss because the State presented insufficient evidence that he conspired or formed an agreement with Mr. Harris to traffic in Oxycodone. We agree.

"Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State*

*v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "[A]ll of the evidence, whether competent or incompetent, must be considered in the light most favorable to the [S]tate, and the [S]tate is entitled to every reasonable inference therefrom." *Id.* at 78, 265 S.E.2d at 169.

"A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means." *State v. Bindyke*, 288 N.C. 608, 615, 220 S.E.2d 521, 526 (1975). "As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed." *Id.* at 616, 220 S.E.2d at 526. "To constitute a conspiracy it is not necessary that the parties should have come together and agreed in *express* terms to unite for a common object." *Id.* at 615, 220 S.E.2d at 526. "Direct proof of the charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933).

Nonetheless, "[w]hile a conspiracy may be established from circumstantial evidence, there must be such evidence to prove the agreement directly or such a state of facts that an agreement may be legally inferred." *State v. Massey*, 76 N.C. App. 660, 662, 334 S.E.2d 71, 72 (1985); *see State v. Worthington*, 84 N.C. App. 150, 162, 352 S.E.2d 695, 703 ("[E]vidence tending to show a mutual, implied understanding will suffice to withstand [a] defendant's motion to dismiss."), *disc. review denied*, 319 N.C. 677, 356 S.E.2d 785 (1987). "Conspiracies cannot be established by a mere suspicion, nor does a mere relationship between the parties or association show a conspiracy. If the conspiracy is to be proved by inferences drawn from the evidence, such evidence must point unerringly to the existence of a conspiracy." *Massey*, 76 N.C. App. at 662, 334 S.E.2d at 72 (citation omitted). Thus, "[t]o hold a defendant liable for the substantive crime of conspiracy, the State must prove an agreement to perform every element of the crime." *State v. Suggs*, 117 N.C. App. 654, 661, 453 S.E.2d 211, 215 (1995). Furthermore, "[m]ere passive cognizance of the crime or acquiescence in the conduct of others will not suffice to establish a conspiracy. The conspirator must share the purpose of committing [the] felony." *State v. Merrill*, 138 N.C. App. 215, 221, 530 S.E.2d 608, 612 (2000) (second alteration in

original) (internal quotation marks omitted).

N.C. Gen. Stat. § 90-95(h)(4)(a) provides, in relevant part, that any person who "delivers, transports, or possesses four grams or more of opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate[,] . . . or any mixture containing such substance, shall be guilty of a felony which felony shall be known as 'trafficking in opium or heroin,'" N.C. Gen. Stat. § 90-95(h)(4)(a) (2013), and punished as a Class F felon "if the quantity of such controlled substance or mixture involved . . . [i]s four grams or more, but less than 14 grams." *Id.*

Defendant argues that the evidence was insufficient to prove that he and Mr. Harris formed an agreement to traffic in Oxycodone. While we recognize that a conspiracy may be established by circumstantial evidence and that direct proof of an agreement is not essential to sustaining a conviction of conspiring to commit an offense, even when viewed in the light most favorable to the State, we are not persuaded that the evidence in the present case "point[s] unerringly to the existence of a conspiracy." *See Whiteside*, 204 N.C. at 712, 169 S.E. at 712. Here, the parties do not dispute that there is no direct evidence that Defendant conspired with Mr. Harris to traffic in Oxycodone. Rather, the evidence shows the following:

that Defendant admitted to Officer Bryson that he mailed sixty Oxycodone pills to Mr. Harris; that Defendant sent the pills in an unlabeled pill bottle with a tissue "stuffed down" into the bottle; that Defendant "knew that Mr. Harris did pills and sold pills;" that Mr. Harris's probation officer, Officer Whitson, received a tip that Mr. Harris was currently trafficking in Oxycodone; and that, when the mail carrier delivered the package sent by Defendant to Mr. Harris's residence at the precise time officers were conducting a warrantless search of Mr. Harris's residence, Mr. Harris "seemed nervous."

Our appellate courts have long recognized that "[c]ircumstantial evidence may be of two kinds, consisting either of a number of consecutive links, each depending upon the other; or a number of independent circumstances all pointing in the same direction." *State v. Austin*, 129 N.C. 534, 535, 40 S.E. 4, 5 (1901). "In the former case it is said that each link must be complete in itself, and that the resulting chain cannot be stronger than its weakest link." *Id.* "In the latter case the individual circumstances are compared to the strands in a rope, where no one of them may be sufficient in itself, but all together may be strong enough to prove the guilt of the defendant beyond a reasonable doubt." *Id.* While it appears that a reasonable inference could be drawn from the evidence in

the present case that Defendant's actions were violative of N.C. Gen. Stat. § 90-95(h)(4)(a), whether viewed as links in a chain or strands in a rope, we cannot conclude that a jury could reasonably infer from this same evidence that Defendant and Mr. Harris formed an agreement or conspired to traffic in Oxycodone. Although the evidence demonstrates that Defendant and Mr. Harris had a relationship, "a mere relationship between the parties or association [does not] show a conspiracy." *See Massey*, 76 N.C. App. at 662, 334 S.E.2d at 72. Again, even "cognizance of the crime or acquiescence in the conduct" of another "will not suffice to establish a conspiracy." *Merrill*, 138 N.C. App. at 221, 530 S.E.2d at 612. Thus, while there may be sufficient evidence of Mr. Harris's knowledge of Defendant's actions, we cannot say that there was sufficient evidence that Mr. Harris "share[d] the purpose of committing [the] felony." *See id.* (second alteration in original) (internal quotation marks omitted). Without more, we cannot conclude that the State's evidence directly or indirectly established a union of wills between Defendant and Mr. Harris to conspire to traffic in Oxycodone. Accordingly, we vacate the trial court's judgment entered upon the jury's verdict finding Defendant guilty of conspiring to traffic in Oxycodone by transportation. Our disposition on this issue renders it unnecessary to address

Defendant's remaining issue on appeal and we decline to do so.

Vacated.

Judges GEER and STROUD concur.

Report per Rule 30(e).