THE CITY OF CHARLOTTE, A MUNICIPAL CORPORATION, PLAINTIFF v. BMJ OF CHAR-
LOTTE, LLC; CONSOLIDATED TEXTILES, INC., LESSEE; AND ANY OTHER PARTIES
IN INTEREST, DEFENDANTS

No. COA08-147

(Filed 7 April 2009)

## 1. Appeal and Error— appealability—condemnation—dismissal of counterclaims—interlocutory order—existence of easement

An interlocutory order dismissing defendants' counterclaims while plaintiff's initial claim for determination of just compensation for the pertinent taking was still pending was immediately appealable because: (1) orders from a condemnation hearing concerning title and area taken are vital primary issues; and (2) the possible existence of an easement is a question affecting title, and defendants' counterclaims raise the question of whether an easement existed.

## 2. Railroads— right-of-way—city's use for light rail system—standing of landowner and lessor

The owner and lessor of property subject to a railroad right-of-way had standing to contest plaintiff city's acquisition and use of the right-of-way for a light rail system for public transportation on the ground that the city's actions violated the charter authorizing the railroad.

1

CITY OF CHARLOTTE v. BMJ OF CHARLOTTE, LLC

[196 N.C. App. 1 (2009)]

### 3. Railroads— right-of-way—city's use for light rail system— purpose of railroad—no reversion to fee owner

A city's use of a railroad right-of-way for a light rail system to transport members of the public was within the scope of the "purposes of the railroad" set forth in the amended railroad charter and did not cause the right-of-way to revert to the owner of the underlying fee.

### 4. Railroads— right-of-way—conveyance to city for light rail system—not abandonment—no reversion to fee owner

The conveyance of a portion of a railroad right-of-way to plaintiff city to be used for a light rail system was not an abandonment of the right-of-way which would result in its reversion by operation of law to the owner of the underlying fee.

### 5. Railroads— right-of-way—voluntary alienation by quit-claim deed

An amended railroad charter provision for reversion of the right-of-way "if the said road or any part thereof should be sold at execution sale for the debts of said company or otherwise" did not forbid alienation of the right-of-way by any means other than an execution sale and permitted voluntary alienation by a quit-claim deed.

### 6. Railroads— right-of-way—city's use for light rail system— not overburden of easement—not compensable taking

An increase in rail traffic on a railroad right-of-way by a city's acquisition and use of the right-of-way for a light rail system was not an overburden of the railroad easement that entitles the underlying fee owner and his lessee to compensation for a taking of the easement.

Appeal by defendants from order entered 5 November 2007 by Judge W. Robert Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 24 September 2008.

*Horack Talley Pharr & Lowndes, P.A., by Robert B. McNeill and Phillip E. Lewis, for plaintiff-appellee.*

*Katten Muchin Rosenman LLP, by Richard L. Farley and Jeffrey C. Grady, for defendant-appellant.*

CITY OF CHARLOTTE v. BMJ OF CHARLOTTE, LLC

[196 N.C. App. 1 (2009)]

STROUD, Judge.

This appeal addresses a counterclaim for inverse condemnation[1] filed in response to a condemnation action by the City of Charlotte. The gravamen of the counterclaim is that plaintiff's use of a railroad right of way that runs over defendants' land is in derogation of defendants' rights as the holder of the underlying fee. Defendants offer two different legal theories as to why they are entitled to compensation for use of the railroad right of way. Defendants' first theory is that any rights which might have previously existed to use the railroad right of way have reverted to the holder of the underlying fee estate. Defendants' alternative theory is that even if any rights to use the railroad right of way still exist, the manner in which it is currently being used is beyond the scope of the right of way, thus creating a compensable overburden on the servient estate. For the reasons which follow, we affirm the trial court.

I. Background

On 2 January 1847 the North Carolina General Assembly chartered ("the original charter") "a company to construct a rail road from some point on the South Carolina Rail Road to the town of Charlotte, in Mecklenburg [C]ounty, to be called 'the Charlotte and South Carolina Rail Road Company ["C&SC"].' " The original charter was amended by the General Assembly on 29 January 1849 ("the amended charter") in order to "produce conformity" with the railroad charter granted by the state of South Carolina. The amended charter is the same as the original charter in all material respects relevant to this appeal.

Among the powers granted, section 20 of the amended charter gave C&SC the power to take land by statutory presumption[2] railroad right of way:

---

1. Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *City of Winston-Salem v. Ferrell*, 79 N.C. App. 103, 108, 338 S.E.2d 794, 798 (1986) (citation and quotation marks omitted).

2. The amended charter also granted C&SC the authority to acquire necessary land by purchase (section 17) and by eminent domain proceedings (section 19). The parties stipulated that the right of way *sub judice* was acquired by statutory presumption. For a general discussion of the public policy undergirding the grant of power to take land by statutory presumption, see *Earnhardt v. Southern Ry. Co.*, 157 N.C. 358, 362-63, 72 S.E. 1062, 1064 (1911).

That in the absence of any contract or contracts with the said company, in relation to lands through which the said road or its branches may pass, signed by the owner thereof . . . it shall be presumed that the land upon which the said road or any of its branches may be constructed, together with a space of sixty-five feet on each side of the centre of the said road, has been granted to the company, by the owner or owners thereof; and the said company shall have good right and for a title thereto, and shall have, hold and enjoy the same as long as the same be used only for the purposes of said railroad . . . and no longer, [unless the owner applies for compensation] within two years next after that part of said road was finished[.]

The right of statutory presumption was eventually used by C&SC to acquire a railroad right of way ("the right of way" or "the easement")[3] across property located at what is now 707 East Hebron Street in Charlotte, Mecklenburg County.

In 1969, Robert J. Kunik acquired the property located at 707 East Hebron Street. The property was acquired subject to the right of way, which was held at the time by Southern Railway, successor-in-interest to C&SC.

In 2003, the property was conveyed, subject to the right of way, by Robert J. Kunik's successors-in-interest to defendant BMJ of

---

3. We use the terms "right of way" and "easement" interchangeably throughout this opinion. In fact, the trial court *sub judice* concluded that "[p]laintiff did not acquire title in fee simple absolute to the Western NS Right of Way, but instead acquired only those rights held by Norfolk Southern in the property, to wit: an easement[,]" a conclusion which is not under review in this appeal because neither party assigned it as error.

We are aware that a railroad right of way is not always an easement; it can be a fee estate or another type of interest, depending upon the manner of its creation. *See, e.g., McCotter v. Barnes*, 247 N.C. 480, 485, 101 S.E.2d 330, 334-35 (1958) ("It is a matter of common knowledge that the strip of land over which railroad tracks run is often referred to as the 'right of way,' with the term being employed as merely descriptive of the purpose for which the property is used, without reference to the quality of the estate or interest the railroad company may have in the strip of land."); *King Associates, LLP v. Bechtler Development Corp.*, 179 N.C. App. 88, 94-95, 632 S.E.2d 243, 247-48 (2006) (the deed granting a railroad right of way created a "fee simple determinable" not an easement). However, "[i]t is well settled in this State that the company acquires, by the statutory method, either of condemnation or by presumption, no title to the land, but an easement to subject it to the uses prescribed." *Seaboard Air Line R. Co. v. Olive*, 142 N.C. 257, 265, 55 S.E. 263, 266 (1906); *Raleigh & Augusta Air Line R.R. v. Sturgeon*, 120 N.C. 225, 230, 26 S.E. 779, 781 (1897) ("Our opinion, therefore, is that in the case before us the plaintiff [who acquired a railroad right of way by statutory presumption] has only an easement in the land in dispute.").

CITY OF CHARLOTTE v. BMJ OF CHARLOTTE, LLC

[196 N.C. App. 1 (2009)]

Charlotte, LLC ("BMJ"), a corporation owned by members of the Kunik family. Defendant Consolidated Textiles, Inc. ("Consolidated") is the lessee of the property and operates a warehouse located thereon. On 2 August 1988, Southern Railway executed a license agreement with Consolidated which allowed Consolidated to use the right of way to access the warehouse for truck unloading. On 11 December 2003, Norfolk Southern Railway Company ("NS" or "Norfolk Southern"), the successor-in-interest to Southern Railway, conveyed an interest in the western half of the right of way by quit-claim deed to the City of Charlotte ("the city" or "plaintiff"). Norfolk Southern retained all of its interest in the eastern portion of the rail-road right of way.

The city constructed and began operating a light rail system for transporting the public by rail ("Light Rail") in the western half of the right of way.[4] Light Rail runs from downtown Charlotte to a location just north of Interstate 485, still in North Carolina; it does not connect with any railroad in South Carolina. Light Rail is separate and independent from the rail line currently operated and maintained by Norfolk Southern on the eastern portion of the Norfolk Southern right of way, which will continue to operate.

Light Rail has substantially increased rail traffic upon the right of way. With the addition of Light Rail's two line sections, one running northbound and the other southbound; there are two separate rail-road lines, Light Rail and Norfolk Southern, operating at least 3 separate railroad tracks within the western 65 feet of the right of way. The tracks currently in the Norfolk Southern right of way and used by Norfolk Southern are part of its R-Line, which serves approximately 10 trains per day. Norfolk Southern has no current plans to increase the number of times a train will pass through the right of way, but does expect that its business will grow.

When Light Rail began operation in November 2007, both the northbound and southbound lines began passing through the Norfolk Southern right of way every seven minutes during peak times and every fifteen minutes during non-peak times.[5] As a result, a Light Rail train passes through the Norfolk Southern right of way twice every

---

4. The trial court's findings of fact in the order entered 5 November 2007 were based on the parties' stipulations of fact filed 16 April 2007. The parties stipulated that Light Rail would become operational as of November 2007, so we assume for purposes of this opinion that Light Rail is now actually operating as stipulated.

5. ("Peak times" are 6:00 am to 9:00 am and 3:00 or 4:00 pm to 6:30 or 7:00 pm).

seven minutes during peak times and twice every fifteen minutes during non-peak times. Each time a Light Rail train passes through the Norfolk Southern right of way, the signal gates at the grade crossing of East Hebron Street and South Boulevard come down and stop traffic on East Hebron Street. The gates stay down for about 45 seconds each time.

Light Rail occupies a portion of the Norfolk Southern right of way previously used by Consolidated in connection with its loading docks pursuant to a license agreement with Norfolk Southern. There is a fence between the Light Rail tracks and the Norfolk Southern rail line, which prevents access from South Boulevard to the BMJ property without first going to the street intersection of South Boulevard and East Hebron Street. As a result of the construction and operation of Light Rail, neither Consolidated nor a subsequent tenant can use any portion of the western Norfolk Southern right of way to access the loading docks.

On 22 March 2005, pursuant to N.C. Gen. Stat. § 136-103[6] et seq., plaintiff filed a complaint for condemnation and appropriation of a ten feet wide temporary construction easement adjacent to the railroad right of way and a 2 feet wide by 22 feet long permanent utility easement within the temporary construction easement. Plaintiff deposited the sum of $7,125.00 as its estimate of just compensation for the taking.

Defendants BMJ and Consolidated (collectively "defendants") filed an answer on 5 May 2006. The answer asserted inverse condemnation and overburdening of the easement as counterclaims. The first counterclaim alleged that defendants were entitled to compensation because the city had no interest in the right of way, which defendant asserted no longer exists, having reverted to the holder of the underlying fee. Alternatively, a second counterclaim alleged that even if the easement still exists and the city had an interest in it, the city's use of the easement for Light Rail is beyond the scope of use permitted by the easement.

On 4 April 2007, plaintiff filed a Motion to Determine Issues Other than Damages, pursuant to N.C. Gen. Stat. § 136-108. The

---

6. Ordinarily a city in North Carolina would exercise its power of eminent domain pursuant to Chapter 40A of the North Carolina General Statutes. However, the City of Charlotte was authorized to exercise the power of eminent domain for its public transportation system pursuant to Chapter 136 of the North Carolina General Statutes. N.C. Sess. Law 2001-304.

trial court held a hearing on the motion during the week of 16 April 2007 and entered its order dismissing defendants' counterclaims on 5 November 2007. Defendants appeal from the order dismissing their counterclaims.

## II. Procedural Issues

### A. Interlocutory Order

[1] Because plaintiff's initial claim for determination of just compensation for the taking set forth therein is still pending, the order dismissing defendants' counterclaims did not resolve all of the claims in this action. Hence, the order is interlocutory. *Duval v. OM Hospitality, LLC*, 186 N.C. App. 390, 392, 651 S.E.2d 261, 263 (2007). Generally, an appeal from an interlocutory order will not be reviewed until all claims in the case are resolved by the trial court. *Id.* However, an interlocutory order is immediately reviewable in two circumstances:

> First, the trial court may certify that there is no just reason to delay the appeal after it enters a final judgment as to fewer than all of the claims or parties in an action. Second, a party may appeal an interlocutory order that affects some substantial right claimed by the appellant and will work an injury to him if not corrected before an appeal from the final judgment.

*Dep't of Transp. v. Rowe*, 351 N.C. 172, 174-75, 521 S.E.2d 707, 709 (1999) (citations and quotation marks omitted).

The North Carolina Supreme Court has determined that "orders from a condemnation hearing concerning title and area taken are vital preliminary issues[,]" and has allowed immediate appeal therefrom. *Id.* at 176, 521 S.E.2d at 709 (citation and quotation marks omitted). Even where an order does not address title *per se*, the North Carolina Supreme Court has held that

> "A title is not a piece of paper. It is an abstract concept which represents the legal system's conclusions as to how the interests in a parcel of realty are arranged and who owns them." . . . The possible existence of an easement . . . is a question affecting title; therefore, the trial court's order is subject to immediate review.

*N. C. Dep't of Transp. v. Stagecoach Village*, 360 N.C. 46, 48, 619 S.E.2d 495, 496 (2005) (quoting William B. Stoebuck & Dale A. Whitman, *The Law of Property* § 10.12 (3d ed. 2000)). Because

defendants' counterclaims *sub judice* raise the question of whether or not an easement exists, the order is immediately reviewable.

B. Standing

**[2]** Before we address the issues raised by defendants, we must address plaintiff's sole cross-assignment of error as to defendants' standing. Plaintiff argues that defendants have no standing to contest plaintiff's acquisition and use of the western right of way on the grounds that plaintiff's actions are in violation of the amended charter because only the State of North Carolina has standing to object on these grounds. Plaintiff relies on the following language from *Mallett v. Simpson*, "[n]o one but the State could take advantage of the defect that the purchase was *ultra vires*[,]" 94 N.C. 37, 41 (1886), to argue that "[b]ecause railroad companies established by charter are quasi-public corporations created by state legislative enactment . . . acts of a railroad company alleged to exceed its legislative charter may only be challenged by the [S]tate."

Mallett is unavailing because the language relied on by plaintiff is dicta. Even though the State was not a party to the action, *Mallett* reviewed the railroad's charter and concluded that the railroad's purchase of the land in question was within the rights granted by the charter. *Id.* at 40-41. Furthermore, even if the language relied on by plaintiff had been dispositive, we conclude that it was not addressing the issue of standing. *Mallett* further stated:

> [I]f the corporation acquired the land for any of the purposes authorized by the charter, its purchase and sale was valid; and if on the other hand, it transcends the authority conferred by the charter, its purchase and sale would still be valid against every body except the State, and its title could not be collaterally assailed[.]

*Id.* at 42. We read this language, consistent with the holding, to mean that a party other than the State could have brought an action regarding the railroad's title to the land, but on the merits of the action, only the State could have prevailed. Accordingly, plaintiff's cross-assignment of error as to defendants' standing is overruled and we will review on the merits.

III. Standard of Review

Issues which fall under the purview of N.C. Gen. Stat. § 136-108 are decided, as here, by a judge sitting without a jury. N.C. Gen. Stat.

§ 136-108 (2007); *Dept. of Transportation v. Wolfe*, 116 N.C. App. 655, 657, 449 S.E.2d 11, 12-13 (1994). "It is well settled in this jurisdiction that when the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts." *Willen v. Hewson*, 174 N.C. App. 714, 718, 622 S.E.2d 187, 190 (2005) (citations and quotation marks omitted), *disc. review denied*, 360 N.C. 491, 631 S.E.2d 520 (2006). The propriety of the trial court's conclusions of law is subject to *de novo* review. *Id.*

Defendants assigned error to five of the trial court's conclusions; the "finding" to which defendants excepted is actually a conclusion of law related to construction of the amended charter. Therefore, our entire review is *de novo. See Estate of Gainey v. Southern Flooring & Acoustical Co.*, 184 N.C. App. 497, 503, 646 S.E.2d 604, 608 (2007) (a legal conclusion mislabeled as a finding of fact is reviewed according to its substance not its label).

## IV. Reversion

Defendants contend that the city must compensate them for the use of the land over which the Light Rail runs because all rights in the right of way have reverted to defendants as owner/lessor of the underlying fee. Defendants first argue that the right of way was defeasible at creation and reverted to the owner of the underlying fee because Light Rail is a use not contemplated by the amended charter. Alternatively, defendants argue that reversion resulted by operation of law from the railroad's abandonment of the easement. We disagree as to both.

A. Defeasible at Creation

[3] Section 20 of the amended charter reads in pertinent part:

[T]he said company shall have good right and title [to any right of way acquired by statutory presumption] and shall have, hold and enjoy the same *as long as the same be used only for the purposes of said railroad . . . and no longer . . . .* [I]f the said road or any part thereof should be sold at execution sale for the debts of said company or otherwise, then and in that case all the rights and title to the land which may have been condemned by virtue of this act, shall immediately revert to the original owners, unless the purchaser or purchasers at such sale shall keep up the road for

**CITY OF CHARLOTTE v. BMJ OF CHARLOTTE, LLC**

[196 N.C. App. 1 (2009)]

the use of the public in the same manner and under the same restrictions as by this act it is contemplated that the Charlotte and South Carolina Railroad Company should do.

Defendants contend that the preamble to the original charter defines the "purposes of said railroad" very narrowly: "to construct a rail road from some point on the South Carolina Rail Road to the town of Charlotte[.]" Defendants reason therefrom that use of the right of way for Light Rail and use of the right of way by a carrier that does not connect to the South Carolina Railroad is outside the purpose of the charter, therefore triggering the reversion clause. In essence, defendants argue that any rights of way taken by statutory presumption should be interpreted as use it all or lose it all. We disagree.

The purpose of the railroad is set forth in detail in sections 9 and 10 of the amended charter. Section 9 begins: "That the company shall have power and may proceed to construct as speedily as possible a rail road, with one or more tracks, to be used with steam, animal, or other power[.]" Light Rail runs on two tracks with electric power, a use clearly contemplated by section 9. Furthermore, section 9 recognized piecemeal use of the right of way: "said company *may use any section* of the railroad constructed by them, before the whole said road shall be completed." (Emphasis added.) Light Rail runs on a section of the track rather than the whole. Section 10 adds that the tracks built in the right of way are to be used for "conveyance, or transportation of persons, goods, merchandise and produce, over the said railroad . . . ." Light Rail is used for the purpose of transporting persons, a use contemplated by the amended charter.

We conclude therefore that use of the right of way for Light Rail is within the meaning of the "purposes of said railroad." Accordingly, this assignment of error is overruled.

B. Abandonment

[4] Alternatively, defendants argue that alienation of a portion of the right of way to another entity constituted abandonment which resulted in reversion to the holder of the underlying fee by operation of law. Defendants rely on two nineteenth century cases from other jurisdictions, *Blakely v. Chicago, K. & N.R. Co.*, 51 N.W. 767 (Neb. 1892), and *Platt v. Pennsylvania Co.*, 1 N.E. 420 (Ohio 1885), to argue that the law of railroad easement abandonment in North Carolina should be expanded to include conveyance of part or all of the ease-

ment to another party, even another railroad operator, *see* N.C. Gen. Stat. § 1-44.1 (2007) (the passage of seven years after removal of tracks is presumed to be abandonment); *Raleigh, C. & S. Ry. Co. v. McGuire*, 171 N.C. 277, 281-82, 88 S.E. 337, 339 (1916) ("It is well settled that a railroad company does not abandon the land on which it has constructed its tracks so as to entitle the owner to revoke its license by ceasing to operate freight or passenger trains over it, where it continues to use it for purposes incident to and connected with its business in operating the road."); *Skvarla v. Park*, 62 N.C. App. 482, 487, 303 S.E.2d 354, 357 (1983) ("The essential acts of abandonment are the intent to abandon and the unequivocal external act by the owner of the dominant tenement by which the intention is carried to effect.").

We conclude first that *Blakely* is wholly inapposite to the facts *sub judice*. *Blakely* strictly construed a deed expressly granting a right of way to only one railroad, holding that the grantee railroad was thereby prohibited by the deed from conveying part of the right of way, even to another railroad. 51 N.W. at 767. There is no grant of an easement by deed *sub judice*; therefore we conclude *Blakely* has no application.

*Platt* is closer on its facts but does not persuade us. First, the underlying grant of authority in *Platt* is different from that *sub judice*; *Platt* strictly construed a statute allowing a railroad to acquire rights of way by eminent domain proceedings. 1 N.E. at 421. The language of the statute under review in *Platt* allowed a railroad to " 'appropriate as much [land] as may be deemed necessary for its railroad[.]' " *Id.* (quoting the relevant statute). In comparison, the taking by statutory presumption provision of the amended charter *sub judice* is broader in scope, giving C&SC the right to take land by statutory presumption to be "used only for the purposes of said railroad." Two specific words in the *Platt* statute, "its" and "necessary," which were important to the holding of *Platt*, *id.* at 426, do not appear in the relevant portion of the amended charter *sub judice*.

Second, the basis of the holding of *Platt* is not clear. *See id.* at 433 (McIlvaine, J., dissenting). *Platt* offered two reasons for finding abandonment; it is not clear which one, if either, was dispositive. *Id.* at 427. Besides language suggesting that the easement was abandoned by conveyance to another railroad, *Platt* further noted disuse of the right of way for twenty-one years was also grounds to find abandonment. *Id.* Moreover, the *holding* of *Platt* treats the conveyance of the

easement to another railroad not as an abandonment leading to reversion, but as a compensable overburdening of the easement, *id.*, which is an issue in this case discussed more fully *infra* Part V.

Third, *Platt* does not appear to be the majority rule; at least some jurisdictions which have considered the issue have held otherwise. J. A. Connelly, Annotation, *What Constitutes Abandonment of a Railroad Right of Way*, 95 A.L.R.2d 468, 498 (1964) ("[A] sale or conveyance of a right of way for continued use as a right of way does not generally amount to an abandonment." (Citing for example, *Crolley v. Minneapolis & St. L. Ry. Co.*, 16 N.W. 422, 424 (Minn. 1883) ("A sale of a right of way [taken by condemnation to another railroad operator] is not equivalent to an abandonment."))). A holding from a jurisdiction which does not represent the majority rule is less persuasive on this Court. *See State v. Bindyke*, 288 N.C. 608, 627, 220 S.E.2d 521, 533 (1975) ("After considering the decisions expounding both the majority and minority views we are constrained to adopt the majority rule . . . .").

Fourth, *Platt* would likely not avail for defendants even in Ohio. *Platt* was criticized and limited to its facts by the Supreme Court of Ohio over one hundred years ago. *Garlick v. Pittsburgh & W. Ry. Co.*, 65 N.E. 896, 899-900 (Ohio 1902) ("Instead of intending to abandon the premises in the legal sense, the grantors, for a consideration, sold and conveyed them to be used for the same purposes, which negatives the idea of abandonment. . . . It is urged with much force that this court has decided otherwise in *Platt* . . . . [However, t]he facts in [that] case[] are materially different[] and the questions arose in a different manner, and hence we are not called upon to overrule them in order to decide this case. We are entirely clear, however, that the doctrine of [that] case[] should not be extended beyond the particular facts upon which [it] stand[s].").

We are further disinclined to be persuaded by *Platt* because North Carolina courts that have addressed conveyances of rights in a railroad right of way by a railroad have not construed the rules governing rights of way as strictly as *Platt*. *See generally* Jeffrey Alan Bandini, Comment, *The Acquisition, Abandonment, and Preservation of Rail Corridors in North Carolina: A Historical Review and Contemporary Analysis*, 75 N.C. L. Rev. 1989, 2022 (1997) ("Courts generally have refused to find an abandonment when a railroad leased or sold a right of way for uses not inconsistent with railroad purposes."). One of the leading North Carolina cases on the

issue is *Atlantic Coast Line R.R. v. Bunting*, which stated the rule that "[a] railroad company would not be permitted to sell or farm out any portion of its right of way to an individual for any purposes extraneous to its chartered rights and duties." 168 N.C. 579, 581, 84 S.E. 1009, 1010 (1915). In applying this rule, *Atlantic Coast Line* discussed *Coit v. Owenby*, 166 N.C. 136, 81 S.E.1067 (1914), noting that the "railroad [in *Coit*] had [no] right to rent out the right of way to an individual for strictly personal or private business purposes. [However, the railroad was allowed to lease the right of way] to a patron of the road as a terminal facility for receipt and shipment of freight, . . . *to the extent that it did not interfere with the facilities for serving the public*." 168 N.C. at 581, 84 S.E. at 1010 (emphasis added). *Coit v. Owenby* was further discussed in *Sparrow v. Dixie Leaf Tobacco Co.*, which found that the defendant tobacco company "receive[d] its merchandise for processing and storage purposes and . . . ha[d] to truck its merchandise from the warehouses to the railroad loading platform[, therefore] the warehouses [were] not intended primarily for the storage of tobacco for reshipment or to furnish the tobacco company with facilities for the shipment thereof." 232 N.C. 589, 594-95, 61 S.E.2d 700, 704 (1950). Accordingly, *Sparrow* held that the tobacco company's use of the railroad right of way was not permitted because "the railroad company possesse[d] no right or authority to use or to let the property for *private or nonrailroad* purposes." 232 N.C. at 593, 61 S.E.2d at 703 (emphasis added).

In contrast to *Sparrow*, the city *sub judice* is a municipal corporation which uses the right of way for Light Rail. Light Rail is for public use, not private use, and it is certainly a railroad purpose as it transports persons by means of a rail line. In sum, we are not persuaded that conveying a railroad right of way to another entity to be used for rail transportation is an abandonment of the right of way which results in reversion to the owner of the underlying fee.[7] Accordingly, this assignment of error is without merit.

---

7. Even if the right of way were to be considered abandoned according to the law of this State, current federal law mandates that "[a]n abandonment [of a railroad line that is part of an interstate rail network] may be carried out only as authorized under" Chapter 109 of the United States Code. 49 U.S.C. § 10903 (2000); *Preseault v. I.C.C.*, 494 U.S. 1, 8, 108 L. Ed. 2d 1, 11 (1990) ("State law generally governs the disposition of reversionary interests, subject of course to the [federal government's] 'exclusive and plenary' jurisdiction to regulate abandonments and to impose conditions affecting postabandonment use of the property." (Citations omitted)). There is no evidence in the record that an abandonment pursuant to Chapter 109 has been authorized by the federal government.

## V. Use/Overuse

Defendants argue that even if the easement still exists and has not reverted to the holder of the underlying fee, the city's use of the easement is unauthorized, for which it must compensate defendants as holder of the servient estate. Defendants first argue that the city's purported acquisition of a portion of the right of way by quitclaim deed gave it no interest in the land, because the amended charter forbids alienation of the right of way. Alternatively, defendants argue that even if the right of way were alienable, the city's use of the right of way for Light Rail overburdens the servient estate, for which defendants, as owner and lessor of the servient estate, are entitled to compensation.

### A. Voluntary Alienation

[5] Defendants argue that the amended charter forbids alienation of the right of way by any means other than an execution sale. It is undisputed that the quitclaim deed conveying rights in the easement to the city was not pursuant to an execution sale.

Defendants quote from section 20 of the amended charter: "if the said road or any part thereof should be sold at execution sale for the debts of said company or otherwise, then [the land acquired by statutory presumption] shall immediately revert. . . . Based on this language, defendants argue that "[a]pplying the canon of construction *expressio unis* [sic] *est exclusio alterius*,[8] the Charter must be interpreted to allow a sale only by execution." (Underlining in original; footnote added.) Defendants rely on the reasoning in the "uncontested section" of Justice Bynum's dissent in *State of N.C. v. Richmond & Danville Railroad Co.*, which stated "the act cited authorizes a sale for debt only, and therefore when there is no debt there is no power of sale." 72 N.C. 634, 651 (1875) (Bynum, J., dissenting).

Even if we were to accept that a section of Justice Bynum's dissent was "uncontested" simply because the Court's holding did not address it, Justice Bynum's reasoning is wholly inapposite *sub judice*. The "act" to which Justice Bynum referred, Chapter 138, section 5 of the Public Laws of North Carolina, 1871-72 ("the Free Railroad Act"), reads in pertinent part:

---

8. "*Expressio unius est exclusio alterius*" means "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." *Black's Law Dictionary* 620 (8th ed. 2004).

[W]henever the purchaser or purchasers of the real estate, track and fixtures of any railroad corporation which has heretofore been sold or may be hereafter sold by virtue of any mortgage executed by such corporation or execution issued upon any judgment or decree of any court shall acquire title to the same in the manner prescribed by law, such purchaser or purchasers may associate with him and them any number of persons, and make and acknowledge and file articles of association as prescribed in this act; such purchaser or purchasers and their associates shall thereupon be a corporation with all the powers, privileges and franchises, and be subject to all the provisions of said act.

1871-72 N.C. Pub. L. ch. 138 § 5, at 188.

However, section 20 of the amended charter *sub judice* adds a key word not found in the above-quoted section of the Free Railroad Act, invoking the revision clause for nonuse as a railroad "if the said road or any part thereof should be sold at execution sale for the debts of said company *or otherwise*[.]" (Emphasis added). The amended charter therefore recognizes the possibility of alienation at *either* an execution sale *or* another type of sale. This reading of the amended charter is further supported by the language in section 27 of the original charter, which is the same as the amended charter, except that it has a comma before "or otherwise": "if the said road, or any part thereof, should be sold at execution sale for the debts of said company, or otherwise, [then the condemned land] shall immediately revert. . . ." (Emphasis added.) We doubt that the drafters of the amended charter intended to limit the alienability of a railroad right of way to an execution sale by simply omitting a comma.

Defendants' argument offers no explanation for the meaning of the word "otherwise," and appears to imply that there is some sort of execution sale other than one for payment of debts. However, the meaning of "execution sale," then and now, is a forced sale pursuant to a writ of execution for the payment of debts. *Compare* N.C. Gen. Stat. § 1-302 (2007) ("Where a judgment requires the payment of money or the delivery of real or personal property it may be enforced in those respects by execution, as provided in this Article."), *and* N.C. Gen. Stat. § 1-303 (2007) ("There are three kinds of execution: one against the property of the judgment debtor, another against his person, and the third for the delivery of the possession of real or personal property, or such delivery with damages for withholding the same. They shall be deemed the process of the court[.]"), *with*

*Sheppard v. Bland*, 87 N.C. 163, 167 (1882) ("[E]very execution presupposes a judgment of some sort, and the right given to issue the one implies the existence of the other."), *and Rencher v. Wynne*, 86 N.C. 268, 271 (1882) ("The debts reduced to judgment, and on which issued the execution by virtue of which the goods were taken and sold[.]"), *and Broyles v. Young*, 81 N.C. 315, 319 (1879) ("[D]ocketing a transcript [has no] other effect than to constitute a lien of record on all the real estate of the debtor, and the right to have it sold by execution."); *see also Black's Law Dictionary* 1364 (8th ed. 2004) (defining execution sale as "[a] forced sale of a debtor's property by a government official carrying out a writ of execution.").

Even if we accepted an interpretation of section 20 of the amended charter which rendered the word "otherwise" as meaningless surplusage, restraints on alienation are disfavored as a general proposition, *Wachovia Bank & Trust Co. v. John Thomasson Construction Co.*, 3 N.C. App. 157, 162, 164 S.E.2d 519, 522 (1968), *modified on other grounds and aff'd*, 275 N.C. 399, 168 S.E.2d 358 (1969), as are easements in gross, *Gibbs v. Wright*, 17 N.C. App. 495, 498, 195 S.E.2d 40, 42-43 (1973). Consistent with those two principles, North Carolina law recognizes the alienability of railroad rights of way. This was clearly stated in *McLaurin v. Winston-Salem Southbound Railway Co.*:

> The plaintiffs contend that N.C.G.S. § 62-220 lists the powers of railroads and nowhere in those powers is the right to sell real property. They contend a railroad does not have the power to sell for a nonrailroad purpose property it acquired for a railroad purpose. The plaintiffs have not cited any authority for this proposition. More than 140 years ago it was held in an opinion written by Chief Justice Ruffin, *State v. Rives*, 27 N.C. (5 Ired.) 297 (1844), that land used by a railroad for a railroad purpose may be sold by the railroad. Assuming that the plaintiff has standing to raise this issue, we hold we are bound by *Rives* to hold a railroad has the power to sell property which has been acquired for railroad purposes.

323 N.C. 609, 613, 374 S.E.2d 265, 268 (1988). The North Carolina General Statutes also recognize the alienability of railroad rights of way: "In exercising its power to preserve railroad corridors, the Department of Transportation . . . may *acquire property that is or has been part of a railroad corridor* by purchase, gift, condemnation, or other method, provided that the Department may not condemn part of an existing, active railroad line." N.C. Gen. Stat.

§ 136-44.36B. (emphasis added). In addition, the alienability of railroad rights of way is tacitly supported by cases wherein railroad rights of way have been conveyed. *See, e.g., Dowling v. Southern Ry. Co.*, 194 N.C. 488, 490, 140 S.E. 213, 214 (1927) (stating as fact that "[t]he defendant, Southern Railway Company, is the successor in title to all the right, title, and interest formerly owned by the A[tlantic], T[ennessee] & O[hio] R[ailroad] Company in and to said line of railroad and its appurtenances, and is now engaged in operating the same."); *Raleigh Storage Co. v. Bunn*, 192 N.C. 328, 135 S.E. 31 (1926) (recognizing the validity of the transfer of railroad lines and rights of way from the Raleigh, Charlotte & Southern Railway Company to the Norfolk Southern Railroad Company).

Accordingly, we conclude that C&SC had the right to sell or transfer its right of way, even without an execution sale, as did all of its successors in title, including Norfolk Southern. This assignment of error is without merit.

B. Overburdening

[6] Defendants contend that even if the railroad could have alienated the easement, the city acquired the right to no greater use than the original grantee and therefore use of the easement for Light Rail is a compensable overburden on the easement. Again, we disagree.

The following rules apply when overburdening or misuse of an easement is at issue:

> First, the scope of an express easement is controlled by the terms of the conveyance if the conveyance is precise as to this issue. Second, if the conveyance speaks to the scope of the easement in less than precise terms (i.e., it is ambiguous), the scope may be determined by reference to the attendant circumstances, the situation of the parties, and by the acts of the parties in the use of the easement immediately following the grant. Third, if the conveyance is silent as to the scope of the easement, extrinsic evidence is inadmissible as to the scope or extent of the easement. However, in this latter situation, a reasonable use is implied.

*Swaim v. Simpson*, 120 N.C. App. 863, 864, 463 S.E.2d 785, 786-87 (1995) (quoting [1] Patrick K. Hetrick & James B. McLaughlin, Jr., *Webster's Real Estate Law in North Carolina* § 15-21 (4th ed. 1994)), *aff'd*, 343 N.C. 298, 469 S.E.2d 553 (1996). Because the terms of the conveyance *sub judice* are precise, the terms of the conveyance are dispositive.

Defendants rely entirely upon *Grimes v. Virginia Elec. & Power Co.*, 245 N.C. 583, 96 S.E.2d 713 (1957). In *Grimes,* the plaintiff granted an express easement by contract to the defendant for power lines. *Id.* at 583, 96 S.E.2d at 713-14. The defendant later granted a license to the City of Washington to add additional lines on the same poles. *Id.* at 584, 96 S.E.2d at 714. The plaintiff sued for compensation for the additional servitude on his land, while the defendant contended that "the plaintiff's grant was to the Virginia Electric & Power Company [("VEPC")] and to its successors and *assigns,* and permitted it to make the assignment to the City of Washington." *Id.* (emphasis in original).

The Supreme Court rejected the defendant's argument stating:

> The answer to the defendant's contention is that the Virginia Electric & Power Company has not assigned anything. It still retains its right to maintain its full complement of wires and other facilities and to transmit electricity within the full limits of its grant. The contract between the defendants permits the power company to retain all its facilities and, in addition, permits the City of Washington to transmit its own current by means of its own wires attached to the power company's poles. The plaintiff was not a party to the contract between the defendants. The additional lines of the city, with the right to enter upon the lands for maintenance purposes, place an additional burden on plaintiff's land without his consent. Two power companies enjoy an easement over his land. He granted only one.

*Id.*

Defendants herein contend that NS's transfer of a portion of the easement is analogous to VEPC's grant of rights to the City of Washington and that the following uses overburden the easement:

> [T]he Light Rail has already tripled the number of tracks over the NS Right-of-Way. In addition, the number of trains that will now pass through the NS Right-of-Way increased from approximately ten (10) per day to as many as seventeen (17) per hour during peak travel times. Each time the Light Rail passes through the Western NS Right-of-Way the signal gates at the grade crossing of E. Hebron Street and South Boulevard come down and stop traffic on E. Hebron. The signal gates come down for approximately 45 seconds and block traffic on and onto E. Hebron Street. There is now a fence between the Light Rail tracks and the rail line upon which Norfolk Southern currently operates. The fence prevents

access from South Boulevard to the BMJ Property without first going to the street intersection of South Boulevard and E. Hebron Street. Finally, the city has the right, separate and independent from the Railroad, to enter the Western NS Right-of-Way for maintenance purposes in connection with Light Rail[.]

(Emphasis added by defendants, citations to the record in original omitted.)

Although *Grimes* may seem similar to the case *sub judice*, the cases differ in three significant ways: (1) the easement at issue in *Grimes* was an express grant by contract from the owner of the servient estate, *id.* at 583, 96 S.E.2d at 713-14, not a taking by statutory presumption; (2) the grantor of the *Grimes* easement did not relinquish any of its rights in the easement, *id.* at 584, 96 S.E.2d at 714, whereas NS did; and (3) the nature of a railroad right of way is very different from that of a utility right of way for power lines.

The plaintiff in *Grimes* granted a very specific express easement to the defendant by contract. *Id.* at 583, 96 S.E.2d at 713-14. To the contrary, the easement *sub judice* was taken by statutory presumption. The power to take easements by statutory presumption included, in section 11 of the amended charter, permission to "farm out," or to lease, the rights to provide rail transportation in this particular right of way. With this authority to "farm out," NS could have leased the western half of the right of way to plaintiff and plaintiff as lessee would have been able to use its portion of the right of way for Light Rail in the same manner as it has actually done. The burden upon the servient estate by another entity's use of the right of way for rail transport was therefore authorized by the amended charter.

While the defendant in *Grimes* did not relinquish any of its rights in the easement when it licensed use of the easement to another entity, *id.* at 584, 96 S.E.2d at 714, Norfolk Southern, the city's grantor, relinquished "all right, title and interest" except for an agreement that the city would not provide freight services, reservation of the right of access to operate and maintain Norfolk Southern equipment, and reservation of the right to temporarily place materials on the easement that would not interfere with the city's use of the easement.

Furthermore, the nature of a railroad right of way is different from many other types of easements, in that the owner of the fee underlying the railroad right of way retains only a "bare fee [which] has no practical value." *City of Statesville v. Bowles*, 6 N.C. App. 124,

129, 169 S.E.2d 467, 470 (1969) (finding no error when the jury was instructed not to consider the fact that the taking of land for a sewer system was merely an easement and not a fee simple interest when determining just compensation). While the owner of the fee underlying a power line easement typically retains substantial ability to use and to travel freely across the area where power lines cross the property, *see, e.g., Hanner v. Duke Power Co.*, 34 N.C. App. 737, 738, 239 S.E.2d 594, 595 (1977) ("[T]he grantor(s) may use said strip of land for growing such crops and maintaining such fences as may not interfere with the use of said right of way by the Power Company for the purposes hereinabove mentioned."), a railroad right of way easement gives the railroad "the complete and perpetual right to occupy and use the land to the total exclusion of the owner of the fee." *Statesville*, 6 N.C. App. at 129, 169 S.E.2d at 470.

Defendants cite no cases, and we find none, wherein a mere increase in traffic volume over an easement results in misuse or overburdening. The North Carolina Supreme Court has specifically held that a railroad may add a second track to an existing track over a right of way taken by statutory presumption. *Earnhardt v. Southern Ry. Co.*, 157 N.C. 358, 366, 72 S.E. 1062, 1065 (1911). In fact, our research showed just two scenarios recognized in North Carolina as misuse or overburdening of easements: (1) using the easement to access other properties not included in the easement, *see, e.g., Hales v. Atlantic Coast Line R. Co.*, 172 N.C. 104, 90 S.E. 11 (1916) (railroad may not unilaterally extend a side track to serve other businesses not included in an easement granted to serve only one parcel of land); *Z.A. Sneeden's Sons v. ZP No. 116*; —— N.C. App. ——, ——, 660 S.E.2d 204, 211-12 (2008) (reversing summary judgment when the intent of the parties as to the scope of the easement was not clear); and (2) using the easement for a kind of use not contemplated in the easement, *see, e.g., Moore v. Leveris*, 128 N.C. App. 276, 281, 495 S.E.2d 153, 156 (1998) (easement to use neighborhood road would not allow defendant to place sewer line under road); *Swaim*, 120 N.C. App. at 864-65, 463 S.E.2d 787 (easement for ingress and egress does not permit installation of domestic utilities); *Leonard v. Pugh*, 86 N.C. App. 207, 209, 356 S.E.2d 812, 814 (1987) (converting a residential easement to commercial use overburdens the easement); *accord Baldwin v. Boston & M. R. R.*, 63 N.E. 428, 430 (Mass. 1902) (holding that a footpath originally used by one household was not overburdened when it was used by five households and noting that "[n]o case has been shown to us, nor are we aware of any, where the change in the

CITY OF CHARLOTTE v. BMJ OF CHARLOTTE, LLC

[196 N.C. App. 1 (2009)]

use of the land has been only in degree, and not in kind, in which it has been held that the way could not be used to the land in the changed condition, especially if there was no increased burden upon the servient estate.") (cited in 1 Patrick K. Hetrick & James B. McLaughlin, Jr., *Webster's Real Estate Law in North Carolina* § 15-22, at 738 n.199 (5th ed. 1999)).

We conclude therefore that the increase in rail traffic on the right of way does not create a compensable taking. It follows that if the frequency of rail traffic brought by the Light Rail affords no relief for defendants, then the fact that the signal gates block traffic, a direct consequence of the amount of rail traffic, is of no moment either.

As to the fence which prevents Consolidated from crossing the right of way to reach its warehouse, Consolidated's license agreement with Southern Railway, Norfolk Southern's predecessor in interest, included provisions regarding the parties' understanding that Norfolk Southern maintained control over the right of way and that Consolidated could continue to occupy the right of way only upon permission of Norfolk Southern. Norfolk Southern retained its rights to enter onto the railroad right of way at all times to operate, maintain, reconstruct, or relocate its track.

In sum, none of the uses put forward by defendants amounts to a misuse or overburdening of the easement. The result might be different if the owner of the railroad right of way sought to change the use of the right of way entirely or to add a different non-railroad type of use to the right of way easement. *See, e.g., Teeter v. Postal Telegraph Co.*, 172 N.C. 784, 785, 90 S.E. 941, 941 (1916) ("It is not denied by defendant that the telegraph line superimposed upon a railroad right of way is an additional burden which entitled the owner to compensation."); *Hodges v. Western Union Tel. Co.*, 133 N.C. 225, 234-35, 45 S.E. 572, 575 (1903) (installation of telegraph or telephone lines on a railroad right of way overburdens the easement if they are not for railroad purposes). However, that is not the case before us. Accordingly, this assignment of error is overruled.

## VI. Conclusion

We conclude that rights to the easement did not revert to the holder of the underlying fee. The city's use of the easement was not unauthorized and did not overburden the servient estate. Accordingly, we affirm the order dismissing defendants' counterclaims for inverse condemnation and remand to the trial court for fur-

ther proceedings for determination of just compensation based upon the city's original claim.

Affirmed.

Judges STEELMAN and JACKSON concur.