IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-58

No. COA21-177

Filed 1 February 2022

Hoke County, Nos. 14 CRS 51852-53, 17 CRS 152

STATE OF NORTH CAROLINA

v.

STANLEY MARCUS DRAUGHON and PHYLLIS ANN MULL

Appeal by defendants from judgments entered 4 December 2019 by Judge Michael A. Stone in Hoke County Superior Court. Heard in the Court of Appeals 11 January 2022.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Kayla D. Britt and Assistant Attorney General Nicholas R. Sanders, for the State.*
>
> *Jarvis John Edgerton, IV, for defendant-appellant Draughon.*
>
> *Hynson Law, PLLC, by Warren D. Hynson, for defendant-appellant Mull.*

ARROWOOD, Judge.

¶ 1 Stanley Marcus Draughon ("Draughon") and Phyllis Ann Mull ("Mull") appeal from judgments entered upon jury verdicts finding Draughon guilty of assault with a deadly weapon with the intent to kill inflicting serious injury ("AWDWIKISI") and conspiracy to commit AWDWIKISI, and finding Mull guilty of conspiracy to commit AWDWIKISI. Draughon argues the trial court erred in denying his motion to

suppress cell phone evidence and in denying his motion to dismiss for insufficient evidence. Mull argues the trial court erred in denying her motion to dismiss for insufficient evidence and in denying her motion for judgment notwithstanding the verdict. For the following reasons, we hold that both defendants received fair trials free from error.

## I.  Background

¶ 2        On 16 November 2015, a Hoke County grand jury indicted Draughon for AWDWIKISI and robbery with a dangerous weapon. On 3 April 2017, a Hoke County grand jury indicted Mull for AWDWIKISI, robbery with a dangerous weapon, and conspiracy to commit AWDWIKISI. The grand jury returned superseding indictments on 9 April 2018 charging Mull with the same crimes and adding an additional charge against Draughon for conspiracy to commit AWDWIKISI.

¶ 3        The cases were joined for trial over Draughon's objection and came on to be tried at the 18 November 2019 Criminal Session of Hoke County Superior Court, Judge Stone presiding. Both defendants pleaded not guilty to all charges. The evidence presented at trial tended to show as follows.

¶ 4        Beginning in 1994, Perry McBryde ("McBryde") lived with Mull in a home on a 35-acre property in Raeford, North Carolina. At some point in 1997, the relationship between McBryde and Mull "had kind of advanced to where [they] were going to get married," and Mull's name was added to the deed for the property.

McBryde and Mull had a child together in 2007, but the relationship steadily deteriorated; by early 2011, there was not "much to" the relationship, but the two continued to live together for their daughter's benefit.

On 26 September 2014, McBryde picked his daughter up from school early because they "were going to go shopping" for McBryde's birthday. When McBryde and his daughter walked into McBryde's home, they saw Mull in the kitchen with a man who was sitting at the kitchen bar. McBryde's daughter asked Mull who the man was, and Mull responded, "Stan." McBryde then asked the man for his name, and the man immediately responded by asking McBryde for his name. McBryde approached the man and said "Look, you're in my house. What is your name?" The man responded, "I'm Stanley Draughon." McBryde recognized the name and told Draughon that he "didn't want him there because of [McBryde's] daughter and that he needed to go." Draughon did not leave and said, "I'll be here as long as [Mull] wants me here," to which McBryde responded, "You need to go because if you don't go, there's going to be trouble. I don't want you around my daughter." McBryde and his daughter left to go shopping.

On 16 October 2014, McBryde spent the evening watching football in his office, located in a building on the same property as his home. After the football game ended, McBryde drove his truck back to his house from the office building. When McBryde went to unlock and open the door, it "opened just a little bit, a few inches, and it

abruptly shut right back and then it just swung open." As the door swung open, McBryde saw Draughon and a man he did not recognize standing in the doorway; both were wearing "black toboggan[s]" that did not cover their faces. McBryde also saw Mull standing behind the two men "wearing a white-ish colored nighty with . . . roses on it."

¶ 7        Almost immediately after the door opened, Draughon hit McBryde above his left eye with a blunt object that "was two or three [feet] long." McBryde "bear-hugged" Draughon to prevent Draughon from continuing to hit McBryde, but McBryde began to get hit in the back "with something that was burning" which McBryde later learned was a taser. McBryde tried to get away but tripped over the tongue of the trailer attached to his truck and fell on his back.

¶ 8        The unidentified man put McBryde in a chokehold, so McBryde pulled out a box cutter[1] that he "always" kept on the right-hand pocket of his jeans so that he could defend himself. McBryde was then hit in the back of the head with an object and attempted to use his arms and legs to shield himself from the beating. McBryde eventually "just laid there and . . . kind of tried to play dead." Draughon and the other man then left the scene, and McBryde called 911 on his cell phone.

¶ 9        Officers Alan Sanchez ("Officer Sanchez") and Tracy Grady ("Officer Grady")

---

[1] McBryde later stated that it was a "blue cobalt box cutter."

and Detective Kelly Jacobs ("Detective Jacobs") with the Hoke County Sheriff's Office responded to the scene. Officer Sanchez was the first to arrive at the scene and noted that McBryde was lying on his back near the truck and appeared to have been "severely beaten[.]" McBryde "[a]ppeared to be in excruciating pain" but told the officers that Draughon had assaulted him. Officer Grady entered the home and continuously yelled "Sheriff's department" and "Come out" but received no response. Officer Grady eventually found Mull in a bedroom in bed with her child; when Officer Grady asked Mull if she had heard or seen "what was going on," Mull stated that she had neither heard nor seen anything. When Officer Grady told Mull that McBryde was laying outside and had been injured, Mull "didn't say anything" and had "[n]o expression." At trial, Detective Jacobs testified that based on his understanding at the scene, the situation was "being looked at so far as an assault, but still in the misdemeanor capacity."

¶ 10      McBryde was transported to the hospital, where he was diagnosed with two broken arms, a laceration above the left eye, two scalp lesions, three right lower extremity wounds, and two left upper extremity wounds. McBryde was referred to Orthopedic Physician Assistant Scott Olson ("Olson") who found several other fractures in his arms and legs. Specifically, Olson determined that McBryde had a displaced fracture in the right ulna, a non-displaced fracture in the left ulna, and a fracture of the ulnar head in McBryde's left arm. Olson described McBryde's injuries

as "nightstick fractures."[2] Olson placed McBryde in casting throughout his body, and a surgeon operated on his right displaced ulnar fracture.

¶ 11 On 29 October 2014, McBryde went to the Hoke County District Attorney's office, where he spoke to a prosecutor and gave a statement to Detective William Tart ("Detective Tart"). Detective Tart subsequently retrieved security camera footage from McBryde's office. After reviewing the footage, Detective Tart confirmed that the footage showed something "consistent with a disturbance, assault[,]" but was unable to identify "specific people[.]"

¶ 12 Detective Tart "reopened the investigation as a felonious assault" after speaking to McBryde and seeing the extent of his injuries. Detective Tart went to McBryde's property and took pictures, checked for traces of blood or biological evidence, and swabbed the truck for DNA. Detective Tart did not submit the swabs for analysis and did not take fingerprints, as nearly two weeks had passed since the assault and the scene was "contaminated" by that time.

¶ 13 On 31 October 2014, Detective Tart called Mull to schedule an interview and take a statement, which took place on 4 November 2014. On 5 November 2014, Detective Tart swore to an arrest warrant on Draughon for charges of felony AWDWIKISI and robbery with a dangerous weapon. Draughon turned himself in at

---

[2] According to Olson, the term originally "came from Britain" and referred to people hit in the arms with "billy clubs" that "would crack the ulna[.]"

the Hoke County Sheriff's Office on 10 November 2014.

¶ 14        When Draughon turned himself in, Detective Tart seized Draughon's cell phone. At trial, when the State began to question Detective Tart about the cell phone, Draughon's trial counsel objected, and the trial court conducted a bench conference outside the presence of the jury. The objection was as follows:

> If Your Honor, please, I lodged an objection to the State making a reference to Mr. Draughon's telephone, and the reason I make that objection is because it was illegally obtained. There were several search warrants that were contained in discovery and one of the search warrants says to search the phone, but looking back at the discovery, none of those search warrants gives law enforcement authority to search a vehicle or vehicle that belonged -- that transported Mr. Draughon to the sheriff's department.
>
> Our information is that on November 10th, 2014, Mr. Draughon turned himself in. He was driven there by his father. He went inside the sheriff's department and while he was inside the sheriff's department, someone from the -- either Mr. Tart or someone from the sheriff department came outside and began searching the vehicle in which Mr. Draughon was a passenger.
>
> We would contend that there was no search warrant for that telephone. There was no search warrant that would allow him to go in that car to search that vehicle. We would contend that a passenger in the vehicle has just as much rights as the driver of that vehicle. The fact that they illegally obtained this telephone, we would ask the Court to not allow them to introduce, number one, any testimony that the phone was seized and, number two, any evidence pertaining to the telephone under the circumstances under which it was seized in this particular case.
>
> So that is my objection. It is illegally obtained, it was

illegally seized. There was no search warrant, no permission given to take the phone, and they took this phone and now [are] trying to introduce it into evidence, Your Honor.

Draughon's objection was overruled, and Draughon's trial counsel noted his exception to the ruling, which was noted for the record.

¶ 15 Detective Tart testified that he obtained a search warrant for the contents of the cell phone. In searching the contact list of Draughon's cell phone, Detective Tart found a number associated with Mull under the name "Phillip Miller." A data extraction of Draughon's phone showed a total of 557 phone calls and 533 text messages made on Draughon's phone between 18 October 2014 and 10 November 2014. Of the 533 text messages, 123 entries were either sent to or from the "Phillip Miller" contact. Sixty-nine of the phone call entries on Draughon's phone had been deleted, many of which apparently had nothing to do with the case; many of the text messages from "Phillip Miller" were not deleted. The data extraction was limited to metadata and did not contain substantive content of the communications.

¶ 16 In October 2016, Mull moved in with Toni Caruso ("Caruso") and stayed with her until around Christmas of that year. At some point while Mull was staying with Caruso, Mull gave Caruso a box opener. At trial, Caruso testified that she asked Mull where it came from, and Mull responded that "[i]t was [McBryde's] and he had it that night." Caruso described the box cutter as "maybe six inches long, blue and silver

looking." After reading a news article about the case, Caruso became concerned about possessing the box cutter and called the Hoke County District Attorney's Office to "see what [she] needed to do with it." A detective collected the box cutter from Caruso's home.

¶ 17      At the close of the State's evidence, both defendants made motions to dismiss all charges. The trial court denied both motions.

¶ 18      Draughon tendered three alibi witnesses in his defense. Paul Alducin ("Alducin") testified that he was an acquaintance of Draughon's and had worked with him at a sound and lighting production company. Alducin testified that on 16 October 2014, he arrived at Louie's Bar in Fayetteville, North Carolina at around 10:15 p.m. and saw Draughon at Louie's Bar at around 10:30 p.m., 11:00 p.m., and 1:00 a.m. that night. Jerry Wayne Godfrey ("Godfrey") also testified that he was at Louie's Bar on the night of 16 October 2014. Godfrey stated that he arrived "[b]etween 8:00 and 8:15" and saw Draughon "standing and walking around" within 15 or 20 minutes of his arrival. Godfrey testified that he left Louie's Bar around 11:30 p.m., and Draughon was still there when he left. Jack Bussey ("Bussey") similarly testified that he arrived at Louie's Bar between 8:00 p.m. and 8:30 p.m., saw Draughon socializing, and saw that Draughon was still at the bar when Bussey left at around 12:30 a.m. Mull did not present any witnesses or evidence.

¶ 19      At the close of all evidence, Draughon and Mull moved to dismiss all charges

for insufficient evidence. The trial court denied Draughon's and Mull's motions with respect to the charges of AWDWIKISI and conspiracy and granted the motions with respect to robbery with a dangerous weapon, dismissing that charge for both defendants.

¶ 20       On 4 December 2019, the jury returned verdicts for both defendants. The jury found Draughon guilty of AWDWIKISI and conspiracy to commit AWDWIKISI. The jury found Mull not guilty of AWDWIKISI and guilty of conspiracy to commit AWDWIKISI.

¶ 21       After the jury returned its verdicts and before proceeding to sentencing, Draughon made an oral motion for judgment notwithstanding the verdict, which Mull joined:

> THE COURT: All right. Mr. John Thompson, moving to sentencing.
>
> [Draughon's counsel]: Your Honor, we would make a motion at this time for judgment notwithstanding the verdict in this case.
>
> THE COURT: All right. Mr. Van Camp, any issues?
>
> [Mull's counsel]: I will join in that motion.
>
> THE COURT: The motion for dismissal of both [Draughon's counsel] and [Mull's counsel] is denied.

¶ 22       The trial court sentenced Draughon to a term of 96 to 128 months imprisonment on the AWDWIKISI conviction and 67 to 93 months imprisonment on

the conspiracy conviction, running consecutively. The trial court sentenced Mull to a

term of 84 to 113 months imprisonment on her conspiracy conviction. Draughon and

Mull gave oral notice of appeal in open court.

## II. Discussion

¶ 23      Draughon contends the trial court erred in denying his motions to suppress

and to dismiss. Mull contends the trial court erred in denying her motions to dismiss

and for judgment notwithstanding the verdict. We address each defendant's appeal

in turn.

### A. Defendant Draughon

#### 1. Motion to Suppress

¶ 24      In superior court, a defendant is generally required to make a motion to

suppress prior to trial "unless the defendant did not have reasonable opportunity to

make the motion before trial or unless a motion to suppress is allowed during trial"

under the remaining statutory subsections. N.C. Gen. Stat. § 15A-975(a) (2021).

> A motion to suppress may be made for the first time during
> trial when the State has failed to notify . . . the defendant,
> sooner than 20 working days before trial, of its intention to
> use the evidence, and the evidence is . . . obtained by virtue
> of a search without a search warrant[.]

N.C. Gen. Stat. § 15A-975(b).

¶ 25      A motion to suppress "must state the grounds upon which it is made[.]" N.C.

Gen. Stat. § 15A-977(a) (2021). A motion to suppress may be summarily denied if the

motion "does not allege a legal basis for the motion[,]" or if the supporting affidavit "does not as a matter of law support the ground alleged." N.C. Gen. Stat. § 15A-977(c). "A motion to suppress made during trial may be made in writing or orally and may be determined in the same manner as when made before trial. The hearing, if held, must be out of the presence of the jury." N.C. Gen. Stat. § 15A-977(e).

"A motion to suppress made at trial, whether oral or written, should state the legal ground upon which it is made." *State v. Roper*, 328 N.C. 337, 361, 402 S.E.2d 600, 614 (1991). "While an affidavit is not required for a motion timely made at trial, the defendant must, however, specify that he is making a motion to suppress and request a *voir dire*." *Id.*

> When a defendant files a motion to suppress before or at trial in a manner that is consistent with N.C.G.S. § 15A-975, that motion gives rise to a suppression hearing and hence to an evidentiary record pertaining to that defendant's suppression arguments. But when a defendant . . . does *not* file a motion to suppress at the trial court stage, the evidentiary record pertaining to his suppression arguments has not been fully developed, and may not have been developed at all.

*State v. Miller*, 371 N.C. 266, 269, 814 S.E.2d 81, 83 (2018). This failure may constitute a complete waiver of appellate review. *Id.* at 273, 814 S.E.2d at 85 ("By doing so, [the defendant] completely waived appellate review of his Fourth Amendment claims.")

Draughon asserts the State did not file any notice of intent to introduce the

challenged cell phone evidence as required under N.C. Gen. Stat. § 15A-975(a), and accordingly Draughon's motion to suppress was timely made during trial. A review of the transcript, however, reflects that Draughon's trial counsel made a general objection without specifying that he was making a motion to suppress. Draughon's trial counsel also never requested a *voir dire*. At no point during the argument did Draughon, the State, or the trial court acknowledge that a motion to suppress was being addressed. The record and transcript reveal that Draughon only made a general objection, and Draughon has failed to meet the burden of establishing that he made a motion to suppress in proper form. Because Draughon did not file a motion to suppress the cell phone evidence before or during trial, he has completely waived appellate review of the issue.

## 2. Motion to Dismiss

¶ 28 Although Draughon made motions to dismiss all charges at the close of the State's evidence and at the close of all evidence, Draughon's appeal only addresses the conspiracy conviction. Accordingly, our review of the trial court's ruling on Draughon's motion to dismiss is limited to the charge of conspiracy to commit AWDWIKISI.

¶ 29 "In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824,

826 (2015) (quotation marks omitted) (quoting *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2002)). "Substantial evidence is [the] amount . . . necessary to persuade a rational juror to accept a conclusion." *Id.* (quoting *Mann*, 355 N.C. at 301, 560 S.E.2d at 781). In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered "in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom[.]" *Id.* (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)).

¶ 30        If the record developed at trial contains "substantial evidence, whether direct or circumstantial, or a combination, 'to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.'" *Id.* at 575, 780 S.E.2d at 826 (quoting *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988)). "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 550 (2018) (citation and quotation marks omitted).

¶ 31        " 'A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means.'" *State v. Billinger*, 213 N.C. App. 249, 255, 714 S.E.2d 201, 206 (2011) (quoting *State v.*

*Bindyke*, 288 N.C. 608, 615, 220 S.E.2d 521, 526 (1975)).

¶ 32      "A mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense." *State v. Bindyke*, 288 N.C. 608, 615-16, 220 S.E.2d 521, 526 (1975) (citation and quotation marks omitted). "The conspiracy is the crime and not its execution." *Id.* at 616, 220 S.E.2d at 526 (citing *State v. Lea*, 203 N.C. 13, 164 S.E. 737 (1932)). "Therefore, no overt act is necessary to complete the crime of conspiracy[,]" and "[a]s soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed." *Id.* (citation omitted). "The existence of a conspiracy may be established by direct or circumstantial evidence." *Id.* Direct proof of a conspiracy "is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *Id.* (citation and quotation marks omitted).

¶ 33      Draughon argues that the evidence raised no more than a mere suspicion that an agreement existed between him and either Mull or the unidentified man to commit the offense of AWDWIKISI. We disagree.

¶ 34      The evidence presented at trial reflected that Draughon and Mull had a relationship, supported by numerous calls and texts between the two and Draughon's presence at McBryde's house on 26 September 2014. Draughon's presence at

McBryde's house raised a conflict between the two, and Draughon stated that he would remain at the house "as long as" Mull wanted him there. McBryde testified that when he was assaulted, he saw Draughon and the unidentified man in the doorway of his home, with Mull standing in the doorway behind them. Draughon and the unidentified man worked together in beating McBryde, with Draughon using a blunt object and the unidentified man placing McBryde in a chokehold and using a taser. Draughon and the unidentified man continued to beat McBryde until he "play[ed] dead." And in October 2016, Mull gave to a third-party the box cutter that McBryde "had that night."

¶ 35        Although each of these indefinite acts and occurrences may have little weight standing alone, taken collectively, they constitute substantial evidence that a conspiracy existed between either Draughon and Mull or between Draughon and the unidentified man to assault McBryde with a deadly weapon, with the intent to kill. The trial court did not err in denying Draughon's motion to dismiss the conspiracy charge.

### B.        Defendant Mull

#### 1.        Motion to Dismiss

¶ 36        The standard of review and rules of law for this issue are the same as previously stated with respect to Draughon.

¶ 37        As previously stated, the evidence presented at trial reflected that Mull had a

friendly relationship with Draughon and that Draughon was at McBryde and Mull's home "as long as" Mull wanted him there. The data extraction on Draughon's phone also revealed a significant volume of calls and text messages between Draughon and Mull between 18 October 2014 and 10 November 2014. McBryde testified that on the night of the assault, he again saw Mull and Draughon together in the home, this time standing in the doorway just before the assault began. And approximately two years after the assault, Mull gave away a box cutter belonging to McBryde, which "he had . . . that night."

¶ 38    The evidence reflects that although Mull and McBryde had been engaged in a romantic relationship, shared a child, and continued to live on the same property, their relationship had deteriorated and animosity existed between the two. On 16 October 2014, Mull invited Draughon and the unidentified man into the house, where they waited for McBryde to return so that they could assault him. Mull was present at the house when police arrived, and McBryde testified that he saw her standing immediately behind Draughon and the unidentified man before the assault took place. Finally, Mull maintained possession of the box cutter that went missing during the assault, and when she gave it to Caruso, she confirmed that it belonged to McBryde and that McBryde had the box cutter "that night."

¶ 39    Taken together, and considering the evidence "in the light most favorable to the State," the evidence points unerringly to the existence of an agreement between

Mull and Draughon for Draughon and an unidentified man to assault McBryde with a deadly weapon, with intent to kill. Although Mull did not take an active part in the assault, "[t]he conspiracy is the crime and not the execution." *Bindyke*, 288 N.C. at 616, 220 S.E.2d at 526 (citation omitted). The trial court did not err in denying Mull's motion to dismiss.

### 2. Motion for Judgment Notwithstanding the Verdict

¶ 40    Mull next argues the trial court erred in denying her motion for judgment notwithstanding the verdict because the jury's verdicts "were legally inconsistent and contradictory," and accordingly this Court should vacate Mull's conviction and grant her a new trial. We disagree.

¶ 41    A motion for judgment notwithstanding the verdict is treated the same as a motion for directed verdict. *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 368-69, 329 S.E.2d 333, 337 (1985) (citations omitted). "In a criminal case, a motion for directed verdict and a motion to dismiss have the same effect and are reviewed under the same standard of review on appeal." *State v. Coleman*, 254 N.C. App. 497, 500, 803 S.E.2d 820, 823 (2017) (citation omitted). Accordingly, a motion for judgment notwithstanding the verdict and a motion to dismiss have the same effect and are reviewed under the same standard of review on appeal.

¶ 42    Rule 10 of the North Carolina Rules of Appellate Procedure provides:

> In order to preserve an issue for appellate review, a party

> must have presented to the trial court a timely request,
> objection, or motion, stating the specific grounds for the
> ruling the party desired the court to make if the specific
> grounds were not apparent from the context. It is also
> necessary for the complaining party to obtain a ruling upon
> the party's request, objection, or motion.

N.C.R. App. P. 10(a). Although this Court may suspend the Rules of Appellate

Procedure to review an unpreserved issue, it may only do so "[t]o prevent manifest

injustice to a party, or to expedite decision in the public interest[.]" N.C.R. App. P. 2.

"[T]he exercise of Rule 2 was intended to be limited to occasions in which a

fundamental purpose of the appellate rules is at stake, which will necessarily be rare

occasions." *State v. Hart*, 361 N.C. 309, 316, 644 S.E.2d 201, 205 (2007) (citations

and quotation marks omitted).

¶ 43 In this case, Mull joined Draughon's oral motion for judgment notwithstanding

the verdict, with Mull's trial counsel stating: "I will join in that motion." Mull's trial

counsel did not state that the basis of her motion was the alleged inconsistent verdicts

of guilty to conspiracy and not guilty to AWDWIKISI, which is the argument Mull

now presents on appeal. Mull's trial counsel did not make any further statements or

arguments with respect to the motion to make apparent the specific grounds for the

motion. Because Mull failed to state the specific grounds for the ruling Mull desired,

the issue is not preserved for appellate review.

¶ 44 Mull requests that we invoke Rule 2 to review the matter because Mull was

sentenced to a minimum of seven years imprisonment "on the basis of what appear to be legally inconsistent and mutually exclusive verdicts, warranting invocation of Rule 2 to prevent manifest injustice." The State, on the other hand, argues that Mull has not shown that the circumstances of this case warrant suspension of the Rules of Appellate Procedure. To resolve this question, we address the merits of Mull's argument.

¶ 45     "In North Carolina jurisprudence, a distinction is drawn between verdicts that are merely inconsistent and those which are legally inconsistent *and* contradictory." *State v. Mumford*, 364 N.C. 394, 398, 699 S.E.2d 911, 914 (2010) (citation omitted). "[W]hen there is sufficient evidence to support a verdict, 'mere inconsistency will not invalidate the verdict.'" *Id.* (quoting *State v. Davis*, 214 N.C. 787, 794, 1 S.E.2d 104, 108 (1939)). "Verdicts are inconsistent when they reflect some logical flaw or compromise in the jury's reasoning." *State v. Watson*, 2021-NCCOA-186, ¶ 38. "[A] verdict is legally contradictory, or mutually exclusive, when it purports to establish that the defendant is guilty of two separate and distinct criminal offenses, the nature of which is such that guilt of one necessarily excludes guilt of the other." *Id.* ¶ 39 (quotation marks omitted).

¶ 46     In *Mumford*, our Supreme Court concluded the verdicts were inconsistent but not contradictory because a conviction for felony serious injury by vehicle "does not require a *conviction* of driving while impaired under N.C.G.S. § 20-138.1 or N.C.G.S.

§ 20-138.2, but only requires a finding that the defendant was engaged in the conduct described under either of these offenses." *Mumford*, 364 N.C. at 401, 699 S.E.2d at 916.

¶ 47 Conspiracy is a distinct and separate crime from a principal offense, even where the principal offense is based on an "acting in concert" theory. *State v. Kemmerlin*, 356 N.C. 446, 477, 573 S.E.2d 870, 891 (2002). "The crime of conspiracy is complete when there is a meeting of the minds and no overt act is necessary." *State v. Christopher*, 307 N.C. 645, 649, 300 S.E.2d 381, 383 (1983) (citation omitted).

¶ 48 In this case, the jury found Mull not guilty of AWDWIKISI and guilty of conspiracy to commit AWDWIKISI. These verdicts are not inconsistent and legally contradictory *or* mutually exclusive. The two crimes are not "such that guilt of one necessarily excludes guilt of the other" and are instead legally consistent. *See Watson*, ¶ 39. Substantial evidence established that Mull and Draughon had a meeting of the minds with respect to the assault on McBryde; this completed the crime of conspiracy, and no overt act on Mull's part was necessary. Mull has failed to show that this case presents a "rare occasion" warranting the exercise of Rule 2, and has also failed to show that the verdicts were legally contradictory or mutually exclusive. Accordingly, we hold that the trial court did not err in denying Mull's motion for judgment notwithstanding the verdict.

### III. Conclusion

For the foregoing reasons, we hold that Draughon and Mull received fair trials free from error, and that the trial court did not err in denying their motions.

NO ERROR.

Judges HAMPSON and CARPENTER concur.